**Bobby F. TANNER, Plaintiff-Appellee, Appellant,**

**Ned A. Knuth et al., Plaintiffs-Appellees, Cross-Appellants,**

v.

**Malcolm McCALL, individually and in his official capacity as Sheriff of Lake County, Florida, Defendant-Appellant, Cross-Appellee.**

No. 78–3211.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1980.

Rehearing and Rehearing En Banc Denied Oct. 16, 1980.

Julius F. Parker, Jr., Tallahassee, Fla., Neal D. Huebsch, Eustis, Fla., for Malcolm McCall.

Ben R. Patterson, III, Tallahassee, Fla., for Bobby F. Tanner.

Before FAY, KRAVITCH and RANDALL, Circuit Judges.

FAY, Circuit Judge:

Five former deputies and a former secretary of the Lake County Sheriff's Department sued Sheriff Malcolm McCall for violating their rights under the first and fourteenth amendments and 42 U.S.C. § 1983 (1976). Plaintiffs alleged that patronage considerations unlawfully motivated McCall's decision not to reappoint them. A jury returned a verdict against plaintiff Bobby F. Tanner, former chief deputy, and in favor of the other plaintiffs. The trial court amended the judgment on the verdict, restricting its reach to McCall in his official capacity only. The court also awarded attorneys' fees under 42 U.S.C. § 1988 (1976), denied the victorious plaintiffs' motion for reinstatement with back and front pay, and partially granted plaintiffs' requests for costs. Sheriff McCall appeals from the trial court's refusal to grant a directed verdict against all plaintiffs, from its damage award against a public entity, and from the fee award. Plaintiff Tanner appeals the trial court's denial of his motion for new trial, which alleged improper evidentiary admissions. The other plaintiffs cross-appeal the denial of reinstatement, back and front pay, and certain costs. They also contend that the court improperly amended the judgment to exclude McCall's individual liability. We reverse the judgments against McCall.[1]

## I. FACTS

Willis McCall, the defendant's father, was sheriff of Lake County, Florida from 1945 to 1972. Malcolm McCall worked in the department for much of that time and was his father's chief deputy from 1966 to 1972.

In 1972, Guy Bliss, a Republican, defeated Willis McCall, a Democrat, in the election for sheriff.

When Sheriff Bliss was elected, he did not reappoint ten of the fifteen deputies, including Malcolm McCall. Under Florida law, a sheriff does not "employ" deputies, but "appoints" them. *Murphy v. Mack*, 358 So.2d 822, 823–24 (Fla.1978). The appointment ends when the sheriff's power ends. By statute,

[s]heriffs may appoint deputies to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible.

Fla.Stat.Ann. § 30.07 (West 1974). A deputy is the sheriff's alter ego and has all the sheriff's sovereign powers, except the power to appoint other deputies. A deputy's actions are those of the sheriff and the sheriff is civilly liable for those actions:

It is essential to law enforcement in the various counties of the State that the people shall be able to place responsibility upon a particular individual, the sheriff. He and he alone appoints his deputies and is responsible for them. It was never contemplated that the sheriffs of the state must perform the powers and duties vested in them through deputies or assistants selected by someone else.

*Blackburn v. Brorein*, 70 So.2d 293, 298 (Fla. 1954). Because of this responsibility, Florida law has reserved to the sheriff absolute control over selection and retention of deputies. *Murphy v. Mack*, 358 So.2d at 825; *Blackburn v. Brorein*, 70 So.2d at 298.

In 1976, Malcolm McCall, running as a Democrat, defeated Bliss's bid for reelection. By this time the department's staff had grown to almost eighty, including between thirty and thirty-five deputies. McCall received approximately three hundred applications for these positions. Before he took office, McCall interviewed al-

---

1. Our reversal of the judgments against McCall renders unnecessary the resolution of the other issues.

most all the Bliss employees as applicants for employment. Generally, the interviews were to acquaint McCall with the employees, their jobs, their attitudes about their jobs, and their feelings about working for McCall. McCall assumed that all employees had supported Sheriff Bliss during his bid for reelection; McCall claims he would have thought less of them if they had not. McCall did not ask interviewees which candidate they had supported or their political party affiliation; he actually discouraged employees from volunteering that information. McCall did not tell any of the plaintiffs that he was not reappointing them for patronage reasons.

McCall decided to reappoint all but nineteen or twenty of the Bliss employees. Three other Bliss employees resigned.[2] Fifty-five of the Bliss employees whom McCall reappointed were still employed in the department when the case was tried.

Plaintiff Carol Campbell was the only office worker McCall did not reappoint. McCall eliminated her position, secretary to the chief deputy. The chief deputy's work is now handled by the sheriff's secretary. Plaintiff Ugorek's position of senior sergeant supervisor also was eliminated. Plaintiff Davenport, the jailer, was replaced by Robert Gnann, who had worked in the pre-1972 department. Plaintiff Tanner, the chief deputy, was replaced by Donald Scism, a Republican who had worked for Lake County from 1962–1972 and for other police and sheriff's departments before returning to Lake County in February of 1977. Plaintiff Carlisle was a deputy working as a plainclothes vice investigator. McCall now has six investigators whose scope of duties is not as departmentalized as it was under Bliss. At least three newly appointed deputies work as investigators; they all had worked for Lake County under McCall's father.[3] One of them, who had worked with Willis McCall from 1950 to 1972, contributed $25.00 to Malcolm McCall's campaign. Plaintiff Knuth was a patrol or road deputy. Eight new road deputies were hired,[4] none of whom worked for the department before 1972 or contributed to McCall's campaign.

Because the department's size fluctuated, pinpointing the number of new appointees at any given time is difficult. The department had less than eighty positions in January of 1977. It had about eighty-five when this case was tried. McCall now has forty officers with arrest powers. He began with between thirty and thirty-five. Since his election, McCall has appointed approximately twenty new officers with arrest powers. McCall did not appoint all of them immediately upon his assumption of office in January, and the record does not reflect which of them filled the five to ten newly created slots. Six of these twenty newly appointed officers had worked with McCall before 1972.[5] Four other people were appointed who had worked for the department in various capacities before 1972. Of those ten, four, including one part-time employee, contributed a total of $135.00 to McCall's $18,000 campaign. Another newly appointed

**2.** The job titles used by Bliss and McCall are not the same. The employees not remaining with McCall included the chief deputy, the detention supervisor, the matron, a radio operator, a process server, a secretary, civil deputies, deputies, investigators, senior sergeant supervisor, and sergeants. Record at 124. The record does not reflect how many of these people held arrest powers. Deputy Oliver and Sergeant Gooden resigned. Civil Deputy Underwood told McCall during his interview that if McCall was starting a juvenile division he would like to stay, but that otherwise he would resign. Transcript at 384–85.

**3.** Two of these investigators, Deputy Flavell and Deputy Secrease, were first hired by Willis McCall but had been retained by Sheriff Bliss until 1973. *See also* note 19 *infra*.

**4.** According to testimony in one of the plaintiffs' proffers, some of the road deputies were hired well after McCall's oath of office on January 3, 1977. One was hired in March, one in April, two in July, and one in December of 1977.

During his testimony, McCall listed eight new road deputies. Transcript at 117. During the proffer, other employees were mentioned, but it is not clear whether they also were road deputies. This proffered testimony did not go to the jury.

**5.** This figure includes Flavell and Secrease. *See* note 3 *supra*.

deputy, who had not previously been with the department, contributed $2.50.

## II. PRETRIAL PROCEEDINGS

Seven days after McCall took office, plaintiffs filed a complaint alleging that McCall wrongfully terminated their employment, that he deprived them of a property interest in their jobs, that he had stigmatized them, damaging their good names and reputations, and that he infringed their first amendment rights to support Sheriff Bliss by terminating or failing to reappoint them because of that support. Plaintiffs moved for a preliminary injunction ordering reinstatement. The court issued a combined order denying the injunction and granting McCall's motion for summary judgment on all but the political patronage claim.[6] *Tanner v. McCall*, 441 F.Supp. 503 (M.D.Fla.1977). As to the patronage claim, the court stated that the plaintiffs had neither presented a prima facie case of politi-

cally discriminatory animus nor shown that infringement of protected freedoms was "the primary and dominant cause" of their failure to be reappointed. *Id.* at 513, 514.[7] Nevertheless, the court held that a genuine issue of material fact existed on whether plaintiffs were not reappointed because of their political views. *Id.* at 514–15. Summary judgment was therefore denied and the case went to trial on the political discrimination—patronage claim.

## III. PARTIES' POSITIONS

Plaintiffs claim they were not reappointed either because of their political support for Sheriff Bliss or because McCall wanted room for appointment of his political supporters. McCall replies that he merely used his best judgment to select from the three hundred applicants those with whom he felt he could work, and those who he felt could do the best job for Lake County.

6. Plaintiffs do not appeal the district court's finding that the plaintiffs had no property interest in their jobs, that they had not been stigmatized, that they had not been denied due process, and that they were not entitled to a preliminary injunction.

7. The district court stated:

In the present case, plaintiffs have the burden to show, both ultimately on the merits, and prima facie on their preliminary injunction motion, that they were not continued in their jobs because of political discrimination. . . . However, plaintiffs have not met their burden. Defendant has indicated that *he did not know or consider the political allegiances* of plaintiffs or any other employees of the sheriff's department when he decided to retain some and replace others. Deposition at 41, 55, 63. Although plaintiffs supported the candidacy of the incumbent sheriff, so did many other employees, who were retained by defendant. Hence, the fact of plaintiffs' uniform political support alone cannot show any infringement of their First Amendment freedoms by defendant. Far from showing anything additional, plaintiffs have indicated that defendant did not inquire, and discouraged voluntary statements, about their political stances in the preceding election. The Court concludes that plaintiffs have not met their burden to show a prima facie case of politically discriminatory animus by defendant.

Furthermore, even if plaintiffs had demonstrated a prima facie case of political discrimination in defendant's decision not to contin-

ue their employment, they would need to show more in order to prevail. Plaintiffs must show that any impermissible infringement of protected First Amendment freedoms (such as political beliefs, expression, and association) was the primary and dominant cause of their terminations. In short, plaintiffs must show that, even if defendant wished to curtail their protected First Amendment freedoms, apart from that wrongful reason, there were no other good reasons that independently justified their discharges.

\* \* \* \* \* \*

Plaintiffs in the present case have not demonstrated anything near a likelihood (1) that they were replaced for politically discriminatory reasons, or (2) that if they had been, there were no other, independent and legitimate reasons to justify replacing them. Defendant, meanwhile, maintains that his decision to replace plaintiffs was based on reasons that, consistent with his campaign promise, would achieve a better operating sheriff's department. Whether those reasons are sound is not within the province of this Court to determine, so long as they are arguably legitimate and not a mere pretext for violating basic constitutional freedoms. Plaintiffs have not established a prima facie case of such pretense that would entitle them to a preliminary injunction.

441 F.Supp. at 513–14 (citations omitted).

On appeal, McCall argues that in this situation even a politically motivated decision would not amount to an impermissible abridgement of plaintiffs' first amendment freedoms. He also asserts that plaintiffs failed to make a prima facie showing that his failure to reappoint them was solely because of their exercise of first amendment freedoms. As to some of the plaintiffs, McCall also argues that he proved independent reasons for his decision not to reappoint them. McCall therefore claims that the court should have granted his motion for directed verdict.

## IV. POLITICAL PATRONAGE

### A. *Constitutional Guidelines*

A discussion of the applicable precedent is necessary to set in the proper context a review of this case. Government employers can neither coerce employees to compromise their beliefs nor place unconstitutional conditions upon public employment. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967). The employee does not, however, receive blanket first amendment protection regardless of the governmental interest. A balance is struck between the employee's first amendment interest and the government's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1735. Not only must the means chosen be rationally related to furthering a paramount or vital governmental interest, but the means must also be closely drawn to avoid unnecessary abridgement of first amendment freedoms. *Buckley v. Valeo*, 424 U.S. 1, 64–65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976); *Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1734.

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court applied this first amendment framework to partisan dismissals of county employees. The sheriff in *Elrod* had discharged or threatened discharge of the Process Division's chief deputy, an office employee, a process server, and a bailiff-security guard. *Id.* at 351, 96 S.Ct. at 2678. The Court held that the Constitution proscribes discharge of non-civil service employees solely because they did not support and were not members of the political party of the newly-elected sheriff, or solely because they had failed to obtain the sponsorship of the leaders of that party. In his plurality opinion, Justice Brennan noted that patronage dismissals are but one form of patronage practice. "The practice also includes placing loyal supporters in government jobs that may or may not have been made available by political discharges." *Id.* at 353, 96 S.Ct. at 2679.[8] Justice Brennan stated the test for balancing private and governmental interests:

> [I]f conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Id.* at 363, 96 S.Ct. at 2685 (footnote omitted). The plurality rejected the position that interests in efficiency and effectiveness were furthered by wholesale replacement of employees whenever a new political party rises to power. *Id.* at 364–67, 96 S.Ct. at 2685–2686. Found to be of greater weight were the employer's interests in political loyalty. The plurality decided, how-

---

**8.** We note that while the Court included the placing of loyal supporters in its definition of patronage practice, it has not been confronted with a situation in which loyal supporters of the elected candidate were preferred over less loyal supporters, neutral applicants, or the supporters of the opposition. The Supreme Court's patronage cases to date have concerned employment decisions based on allegiance to a political party, not to a political candidate. Those cases involved situations in which employment decisions were in effect made by a political caucus, not the elected candidate.

ever, that loyalty too was inadequate to justify wholesale patronage dismissals. "Limiting patronage dismissals to policy-making positions is sufficient to achieve this governmental end." *Id.* at 367–68, 372–73, 96 S.Ct. at 2687. Justices Stewart and Blackmun concurred, stating that a "nonpolicymaking, nonconfidential government employee" cannot be discharged solely because of political beliefs.

■ Recently in *Branti v. Finkel*, —— U.S. ——, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court reaffirmed *Elrod's* principle but modified its exception for policymaking employees. In *Branti*, the Court found constitutional deficiencies in the planned termination of Assistant County Public Defenders solely because they had not been recommended or sponsored by the in-party caucus.[9] In rejecting the argument that assistants are policymaking and confidential employees, the court recast the exception for when an employer could justifiably dismiss employees despite their exercise of their first amendment freedom to choose their political beliefs:

> [I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency.

> \* \* \* \* \* \*

> In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

—— U.S. at ——, 100 S.Ct. at 1294. The Court rejected a blanket exception for policymaking employees. The employer must show that the required political support or affiliation is relevant or essential to the job. *Id.*

**B. Order of Review**

Review of this patronage case can be divided into three steps. The logical first step would be to determine, assuming that plaintiffs' allegations are true, whether the defendant's conduct was an impermissible infringement of first amendment freedoms. Precepts of judicial decisionmaking, however, require consideration first of the non-constitutional grounds raised by appellant. *See New York Transit Authority v. Beazer*, 440 U.S. 568, 582–83 n.22, 99 S.Ct. 1355, 1363–1364, 59 L.Ed.2d 587 (1979); *Rescue Army v. Municipal Court*, 331 U.S. 549, 568–69, 67 S.Ct. 1409, 1419, 91 L.Ed. 1666 (1947) *quoting Ashwander v. TVA*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). We will therefore begin by assuming that plaintiffs' allegations would support a finding of a first amendment violation, and turn to the second question: whether the plaintiffs have met their burden of showing a constitutional deprivation. The final inquiry is whether defendant rebutted this showing with sufficient evidence that the same employment decision would have been reached regardless of the constitutionally protected conduct.

**C. Sufficiency of the Evidence**

Side-stepping the balancing of plaintiffs' first amendment interests against McCall's interests in the efficiency and loyalty of his deputies and employees, we review the plaintiffs' proof of political patronage.

Unlike *Elrod* and *Branti*, this case involves neither the wholesale discharge of out-party employees nor the dismissal of those not sponsored by an in-party caucus.

---

**9.** *Six of nine assistants were scheduled for termination.* "With one possible exception, the nine who were to be appointed or retained were all Democrats and were all selected by Democratic legislators or Democratic town chairmen on a basis that had been determined by the Democratic caucus." —— U.S. at ——, 100 S.Ct. at 1290. The exception was Manuel Sanchez, who was retained because he speaks Spanish, *Finkel v. Branti*, 457 F.Supp. 1284, 1287 n.8 (S.D.N.Y.1978). The plaintiffs were Republicans although one had changed his party registration to Democrat in 1977 to further his chances of being reappointed. —— U.S. at —— & n.4, 100 S.Ct. at 1290.

Political party affiliation has only tangential relevance.[10] McCall is a Democrat. Bliss is a Republican. Nevertheless, McCall did not know or ask the applicants' party affiliation. One plaintiff is a registered Democrat. Transcript at 379. Another is now a Republican, but is listed as a Democrat in his employment file. *Id.* at 319. The other plaintiffs are Republicans. *Id.* at 392, 445, 479. Scism, however, McCall's newly appointed chief deputy, is also a Republican. *Id.* at 267. Little or no other evidence was supplied on the party affiliation of the other retained, newly appointed, and not reappointed employees.[11] Party affiliation does not differentiate the plaintiffs from the new appointees, and plaintiffs do not argue that they were not reappointed because of their affiliation. Their position is that they were not appointed because of their support for Bliss or because McCall wanted to hire his political supporters. Political party affiliation is used only as an inaccurate litmus for whether an employee might be a Bliss or McCall supporter. Plaintiffs' contention can only be that retention or appointment coincided with support and loyalty for a man, not for a political party.

10. Even if party affiliation were more relevant, plaintiffs would not automatically succeed with their claims. The Supreme Court has expressly reserved judgment on whether an employee with broad public responsibilities can be discharged because of party affiliation or loyalty. *Branti v. Finkel,* —— U.S. at —— n.13, 100 S.Ct. at 1294. McCall has continuously argued that Florida deputies are policymaking employees with broad responsibilities. The sheriff's utmost confidence in the loyalty and efficiency of the deputies is essential and relevant under the Florida scheme. McCall therefore argues that his conduct was not constitutionally prohibited.

11. The five retained employees who testified, Bradley, Swingle, Fogle, Johnson and Lutrell, were not asked their party affiliation. Of the four newly appointed deputies who testified, Gnann, Livingston, and Sewell are Democrats and Scism is Republican. No evidence was offered on the party affiliation of the other appointees. Except for that on plaintiffs, no evidence was offered on the affiliation of the people who were not reappointed. Party affiliation is a matter of public record in Florida.

Even in this regard, the facts do not support plaintiffs' position. Unlike the employers in *Elrod* and *Branti,* McCall did not effect a wholesale replacement of employees. He failed to reappoint only between twenty and thirty percent of the employees appointed by Bliss or about twenty of the eighty employees. He did not fire all Bliss supporters. He did not appoint only ardent McCall supporters. He did not appoint only Democrats.[12] Although all the plaintiffs were Bliss supporters, McCall assumed all employees had supported Bliss. McCall actually knew that some of the employees he was reappointing had actively supported Bliss. No evidence was admitted to show that the plaintiffs were more active than most Bliss supporters, or to show that the replacement appointees were more active than most McCall supporters.[13] Only one of the appointees who might have been a replacement for a plaintiff contributed money to McCall's campaign.

Plaintiffs supplied no direct statements by McCall that political patronage motivated his appointments. Statements which might be considered most suggestive of such a motive were not directed to plaintiffs, and do not support an inference of an overall pattern of patronage motive.[14]

12. *See* note 16 *supra* on the use and weight of statistics in this case.

13. Donald Scism, the new chief deputy, was in Seminole County and did not campaign at all for McCall.

14. Deputy Underwood had been the Republican candidate for tax collector in the 1976 election. After Underwood congratulated McCall, McCall said it looked like they were "on the opposite sides this time." Transcript at 385. As they went over Underwood's file, Underwood stated he would not be interested in staying with the department unless McCall had plans for a juvenile division. According to Underwood, the conversation continued as follows:

And he [McCall] said that he was trying his best to get the best qualified deputies and all, and did I understand.

And I said, "Yes." I said, "To the victor goes the spoils."

And he said, "Yes." He said, you know, "I thought I was going to enjoy this very much." But he said, "Some of the decisions I have to make are very hard decisions. And I have had to give a lot of thought to it."

Plaintiffs argue that McCall's statement to Tanner that he would interview all the employees and that "he had his own people he wanted to bring in" supports their claim that McCall was appointing his political supporters.[15] McCall stated at the same time, however, that he did not know who or how many new people he would appoint, although it could be as many as ten or fifteen. Transcript at 406. In context, the statement does not support plaintiffs' position, especially since one would expect McCall to know who it was he planned to appoint if political patronage were a factor. The statement is merely a variation of McCall's continued assertion that he was selecting from the three hundred applicants those who could work best with him to do the best job for Lake County. Obviously all the applicants could not be appointed since less than eighty positions were available.

The other circumstantial proof urged by plaintiffs does not support an inference of patronage. McCall made the appointments after the election, but under Florida law all prior appointments had ended when Bliss left office. Five people who might have been replacements for three plaintiffs had worked with McCall before, but familiarity with an applicant's abilities is not logically equivalent to political patronage.

> And I said, "Malcolm, you know whatever you do, you have to answer to the people for four years."
> And he said, "Yes."
> *Id.*
> Witness Randolph Ward was a Bliss employee who had worked with McCall under the interim Sheriff in 1972. The following is Ward's testimony on McCall's statements to him:
> And he [McCall] said, "Randolph, I have been knowing you a long time." . . . He said, "We never had any hard words or anything. We always got along fine." He said, "But I won't be able to use you in my administration." He said, "You have been a little too active."
> *Id.* at 259. Ward testified that he could not say what McCall meant by "too active." *Id.* at 260. No testimony was admitted on Ward's political activities during the 1976 campaign.

**15.** Campbell may have heard McCall make a similar statement, although after confrontation with her deposition, she said she was not sure

 The evidence is insufficient to support an inference that McCall was motivated by an intent to discriminate against plaintiffs because of their support for Bliss or by a desire to make room for McCall's own political supporters. Part of the plaintiffs' burden is proving that the defendant's intent to discriminate or violate the plaintiffs' constitutional rights was a substantial motivating factor in the employment decision. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). When neutral decisional criteria are utilized by an employer, a plaintiff's case is more difficult to prove. Circumstantial evidence can be used to supply inferences of an intent to infringe constitutional rights. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–565, 50 L.Ed.2d 450 (1977). The strength of the inference, however, depends upon the strength of the circumstances. *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979). In some cases, the inferences fail to ripen into proof. *See Personnel Administrators of Massachusetts v. Feeney*, 442 U.S. 256, 279 n.25, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). In this case no clear statistical pattern of discrimination exists.[16]

whether he said he wanted his own "secretary" or his own "people." Transcript at 479, 487. In his deposition, McCall said he had people he wanted to place in a number of positions. *Id.* at 80–81.

**16.** Whether use of statistical evidence is appropriate in establishing a prima facie case of disparate treatment under Title VII is not altogether clear. *Compare Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830 (D.C.Cir.1977) *with Harper v. Trans World Airlines, Inc.*, 525 F.2d 409 (8th Cir. 1975). *See generally* Comment, *The Role of Statistical Evidence in Establishing a Prima Facie Case of Employment Discrimination: Davis v. Califano*, 14 Ga.L.Rev. 615 (1980). Nevertheless, employers are allowed to introduce statistics as some proof of lack of discriminatory motive in Title VII disparate treatment cases even though such proof is insufficient to demonstrate conclusively that the actions were not discriminatorily motivated. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–2951, 57

The sequence of events, McCall's appointment of employees after an election, was necessitated by the Florida statutory scheme. No procedural or substantive departures were shown. Contemporaneous statements by McCall do not support an inference of political animus. *See Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. at 264–68, 97 S.Ct. at 562–565.[17] The aim in any section 1983 case grounded on a constitutional violation is to ascertain the defendant's motive, even when objective manifestations of intent are all that is available. *See Personnel Administrators of Massachusetts v. Feeney*, 442 U.S. at 274–80, 99 S.Ct. at 2293–2296; *see also City of Mobile v. Bolden*, —— U.S. ——, ——, 100 S.Ct. 1490, 1501–1503, 64 L.Ed.2d 47 (1980). In this case, the objective manifestations do not supply inferences that rise to the level of proof of a subjective intent of political animus.

A final point on the sufficiency of the evidence concerns the trial court's exclusion of some evidence on the training and experience of some appointees. Under Title VII, evidence of qualifications is part of a prima facie case of disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Supreme Court held in *McDonnell Douglas* that a Title VII plaintiff meets his prima facie burden by proving that he was a qualified applicant who was a member of a racial minority group and who was rejected even though the position remained open and the employer continued to consider applicants with similar qualifications. 411 U.S. at 802, 93

S.Ct. at 1824. Direct proof of discrimination is not required, but the elimination of the two most common legitimate reasons for rejection—the plaintiff's lack of qualifications and the employer's lack of positions—creates an inference of discrimination sufficient to shift the burden of proof to the employer. *Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). If the employer articulates a legitimate, nondiscriminatory reason for the decision, the plaintiff can introduce evidence that the employer's justification is merely a pretext for discrimination. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578–79, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

Prima facie proof of a constitutional violation must include evidence of impermissible motive. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1970); *Whiting v. Jackson State University*, 616 F.2d 116, 122 (5th Cir. 1980). Although *Arlington Heights* and *Davis* were equal protection cases, the same burden of proof has been imposed in first amendment cases arising under the due process clause of the fourteenth amendment. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. at 287 n.2, 97 S.Ct. at 576 (citing *Arlington Heights*). A relevant question here is whether proof of the *McDonnell Douglas* factors is sufficient to shift the burden to the defendant in a case grounded on the Constitution. Just as the Court in *Davis* found disparate impact

L.Ed.2d 957 (1978). Title VII plaintiffs may also use statistics reflecting a general pattern of discrimination as some proof that the employer's stated reason for the employment decision is only a pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *but see* the caveat, *id.* at 805 n.19, 93 S.Ct. at 1825 (such generalized determinations may not be controlling as to an individualized hiring decision). Since intent is an element of a prima facie case of disparate treatment based on constitutional rights, statistics reflecting a presence or absence of discriminatory motive can be con-

sidered, although as in such Title VII cases, statistics will not be conclusive proof.

17. Plaintiffs attempted to admit evidence on the tradition of political patronage in the Sheriff's Department. *Arlington Heights* lists past discrimination as a factor relevant to intent. The trial court correctly concluded, however, that actions of past sheriffs were not relevant to Malcolm McCall's motives and would be highly prejudicial. *See City of Mobile v. Bolden*, —— U.S. ——, ——, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (past discrimination is not an original sin that forever taints official action).

alone to be insufficient to prove discriminatory purpose in a constitutional case, so the mere elimination of two common reasons for rejection does not support an inference of discriminatory intent sufficient to shift the burden to a defendant charged with a constitutional violation. As the Court stated in *Furnco* regarding Title VII, "a prima facie showing under *McDonnell Douglas* [is not equivalent to] an ultimate finding of fact as to discriminatory refusal to hire." 438 U.S. at 576, 98 S.Ct. at 2949. Once a case is presented under Title VII using the standards set out in *McDonnell Douglas* or *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), plaintiff can delay producing other proof of intent until the employer proves job-relatedness, business necessity, or a legitimate nondiscriminatory reason for the action. Under the Constitution, however, that proof of intent is part of plaintiff's prima facie burden. Therefore, although proof of the appointees' training and experience was relevant, its exclusion was not reversible error in this case.

 Furthermore, review of the admitted and proffered evidence on plaintiffs' replacements and the proffer on other appointees convinces us that their training and experience do not support an inference of patronage. Campbell and Ugorek were not replaced.[18] Gnann, who replaced plaintiff Davenport, had experience as a patrol deputy, investigator, bank guard, and firefighter. He had prior on-the-job experience in corrections. Transcript at 88, 285. According to plaintiffs' proffer, Scism, who replaced Tanner, was a college graduate with over ten years experience as a deputy for Lake County. Between 1972 and 1977 he worked for the Seminole County Sheriff's Department. Evidence and proffered

testimony was supplied on the qualifications of only three of the investigators who might have replaced Carlisle.[19] Flavell had been a deputy investigating crime in Lake County for an unspecified period before 1972 and for some time under Sheriff Bliss. He was trained at the Orlando Police Academy and had prior experience with the Sanford Police Department. Secrease began as a deputy in 1966. From 1968 with Willis McCall to 1973 with Sheriff Bliss he was a uniformed investigator for Lake County. He had also been an officer with the Groveland Police Department. Sewell had been a deputy with Lake County for twenty-two years. From 1972 to 1977, he was a private investigator. Proffered evidence on the eight road deputies who might have replaced Knuth shows that they all were certified officers with prior training and law enforcement experience. Transcript at 117, 125–32.[20]

McCall was not hiring inexperienced political hacks. Many of the proffers included only evidence to support a meeting of minimum state requirements for certified law enforcement officers. Transcript at 131. Other experience and training qualifying the replacements for the positions was not included in the record. Furthermore, training and experience were not necessarily the only qualifications for these positions. McCall continually claimed he was searching for efficient employees who could work well with him. Personalities did play a role in his decisions and he naturally knew the working personalities of people with whom he had previously worked. Plaintiffs claim McCall was looking for loyalty, but even that may not have been impermissible, especially under the Florida system of strict liability for the acts of deputies. The Supreme Court has on occasion recognized

18. *See* section IV–D *infra*.

19. These three may be the only new appointees among the six investigators. Joseficzyk was a Bliss employee. Whether DePetrillo and Worley were new appointees or. Bliss employees was not stated. Nevertheless, since all employees were treated as applicants, evidence on the other three investigators would have been relevant.

20. Inexplicably, no evidence was proffered on John D. Hart, who was listed as one of the road deputies. As stated in note 4, testimony was proffered on other appointees who were not listed as road deputies. Their qualifications were also quite good. Only one of them began his law enforcement career as a Lake County deputy in 1977; he is a certified officer.

that efficiency and loyalty can be valid governmental interests. *CSC v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 555, 564, 93 S.Ct. 2880, 2885, 2889, 37 L.Ed.2d 796 (1973); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *see Elrod v. Burns,* 427 U.S. at 364–68, 96 S.Ct. at 2685–2687. Because we hold that plaintiffs did not supply sufficient evidence, we do not pass on whether McCall's interests in loyalty and efficiency would in this case outweigh the plaintiffs' interests.

 Plaintiffs did not meet their burden of proving that political discrimination was a substantial or motivating factor in McCall's employment decisions.

## D. *Causation*

 For two plaintiffs, further reason exists for reversing the judgment.[21] McCall submitted evidence that he eliminated the positions held by plaintiffs Campbell and Ugorek. Plaintiffs did not rebut this proof with competent evidence. If the first amendment motive is not the "but for" reason for the refusal to reappoint plaintiffs, their section 1983 action fails. *Givhan*

*v. Western Line Consolidated School District,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–576, 50 L.Ed.2d 471 (1977).

As to Campbell, the jury specifically asked whether the number of secretaries was reduced when McCall took office. Transcript at 651. The court instructed the jury to use its best recollection of the evidence to answer their question. *Id.* at 662–63. A review of the transcript uncovers no competent evidence that the position remained open. Although Campbell disputed it, both Sheriff Bliss and Sheriff McCall testified that Campbell had been the chief deputy's secretary. *Id.* at 144, 171–72, 475–76, 488. The uncontradicted testimony was that McCall eliminated this position; the chief deputy's work is now done by the sheriff's secretary. *Id.* at 112–13, 144. In addition, the office staff was reduced from thirteen employees to twelve. Campbell was the only one of thirteen office employees not reappointed. The current office manager testified that she supervises the eleven other office employees. *Id.* at 173. The evidence was insufficient to support a jury verdict for Campbell.[22]

21. In a pretrial opinion, the district court indicated that the burden of proving no other valid reason for discharge was on the plaintiffs, not McCall. *Tanner v. McCall,* 441 F.Supp. 503, 513–14 (M.D.Fla.1977) *See* note 7 *supra.* That McCall had relied on this pretrial opinion became apparent after the close of the evidence. Transcript at 569. McCall might have offered causation evidence on all plaintiffs, as he did at the post-trial hearing on reinstatement, were it not for that ruling. On cross-examination, Tanner and Davenport were asked about interview questions McCall had asked them on incidents which might have supplied independent reasons for failure to rehire them. *Id.* at 432–35, 458–60. Carlisle testified on direct that McCall said he had been told bad things about Carlisle by the Leesburg Police Chief and the Florida Highway Patrol "[a]nd as a result he wished [Carlisle] the very best and hoped [he] could get a job in the neighboring county. . . ." *Id.* at 362. McCall never testified, however, that these incidents were motivating factors in his decisions. *See id.* at 77–78 (McCall did not want to "hang any laundry out on the line for these gentlemen or this lady"). Despite the

pretrial order, *Mt. Healthy* clearly places on the defendant the burden of proving independent reasons for discharge. McCall did not meet this burden during trial for any plaintiffs other than Campbell and Ugorek.

22. Campbell relied on the following testimony which she gave on cross-examination, to establish that the number of secretaries had not been reduced:

Q. Do you know whether anybody has been employed in the same position that you held prior to January of '77?

A. There have been, as I understand it, three women hired in the office. I don't know exactly what their jobs are.

Transcript at 488. Not only does this testimony fail to prove that the total number of office workers was thirteen or more, but it also does not indicate the source of the information, the jobs the new employees took, or the date when these employees were hired. This testimony was of insufficient probative value to raise a jury question. *See Robertson v. Emory University Hospital,* 611 F.2d 604, 608 (5th Cir. 1980); *Boeing Company v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc).

Even less testimony can be culled from the record concerning Ugorek's position. McCall testified that he eliminated the position of senior sergeant supervisor. Transcript at 87–88. No contradictory evidence was submitted. No evidence indicates whether Ugorek could or should have been considered for another position. McCall therefore met his burden of showing an independent reason for not appointing Ugorek, which is further reason for reversing the judgment for Ugorek.

## V. CONCLUSION

The judgments for plaintiffs Campbell, Carlisle, Davenport, Knuth, and Ugorek are REVERSED. The judgment against plaintiff Tanner is AFFIRMED on other grounds. The denial of a permanent injunction is AFFIRMED. The award of fees and costs to prevailing plaintiffs is REVERSED.