526 F.Supp. 780 (1981)
Mary Jane JOOS, Plaintiff, William Otto Haag, Jr., Plaintiff-Intervenor,
v.
Christopher S. (Kit) BOND, Individually and as Governor of the State of Missouri; Ray S. James, Individually and as Director of the Department of Revenue of the State of Missouri, Defendants.
No. 81-1022-C(4).
United States District Court, E. D. Missouri, E. D.
September 28, 1981.
Anthony J. Coultas and Michael T. Cady, Leland B. Curtis, Kenneth M. Romines, Curtis & Crossen, St. Louis, Mo., for plaintiff.
*781 Michael L. Boicourt, Asst. Atty. Gen., State of Mo., Jefferson City, Mo., for defendants.

FINDINGS OF FACT CONCLUSIONS OF LAW AND JUDGMENT
HUNGATE, District Judge.
This matter is before the Court for judgment on the merits.
Mary Jane Joos, plaintiff, brought this action against the defendants, Missouri Governor Christopher S. (Kit) Bond, Director of Revenue Ray James under 42 U.S.C. § 1983. Plaintiff alleges that her appointment as (motor vehicle license and tax) fee agent for the State of Missouri is being terminated because of plaintiff's political affiliation, and thus, in violation of her First Amendment rights, as defined by recent decisions of the U. S. Supreme Court. The defendants contend that fee agents are not employees of the State of Missouri, and thus, their appointments may properly be terminated because of their political affiliation. Defendants contend that plaintiff was not terminated solely by reason of her political affiliation or beliefs but that other neutral decisional criteria were relied upon. Defendants also submit that even if fee agents are state employees, political affiliation is nonetheless an appropriate requirement for appointment.
This matter was taken up and considered by the Court without trial or evidentiary hearing on the representations and stipulations of the parties that the operational facts were primarily indistinguishable from the facts in Sweeney v. Bond, 519 F.Supp. 124, resulting in the Findings of Fact, Conclusions of Law and Judgment of the Honorable Clyhe S. Cahill, United States District Court Judge, filed on May 19, 1981. The Court desired a prompt adjudication in order to facilitate federal court review of both cases.

Findings of Fact
1. The plaintiff, Mary Jane Joos, is a resident of the State of Missouri within the jurisdiction of the United States District Court for the Eastern District of Missouri. The plaintiff is a fee agent for the Missouri Department of Revenue. The plaintiff is an active Democrat and was appointed as a fee agent during the administration of former Governor Joseph Teasdale, also a Democrat.
2. Prior to her appointment as fee agent, the plaintiff was active in partisan party politics and supported the candidacies of persons running for public office under the Democratic ticket. The plaintiff contributed time or money, or both, to the 1976 gubernatorial candidacy of Joseph Teasdale. The plaintiff contributed time or money, or both, to the 1980 gubernatorial candidacy of Joseph Teasdale. The plaintiff is presently free to and does continue to assert her partisan support of the Democratic party.
3. Defendant Christopher Bond is now the Governor of the State of Missouri. Shortly after his inauguration on January 12, 1981, Governor Bond appointed defendant Ray S. James as the Director of Revenue. Both Bond and James are Republicans. The person appointed to succeed this specific fee agent is a Republican.
4. The plaintiff has been notified by defendant James that her appointment as fee agent is being terminated. Defendant James has appointed a successor to operate the fee agent office held by the plaintiff, entered into a contract with a successor to that office, and begun the training of the successor. A majority of new fee agents appointed by James are Republicans. However, not all fee agent appointments made by James have been Republicans as evidenced the appointment of Democrats and non-partisan civic organizations.
5. Fee agents are authorized under Section 136.055, RSMo 1978, to issue licenses and collect taxes and fees. That statute provides:
1. Any person who is selected or appointed by the state director of revenue to act as an agent of the department of revenue, whose duties shall be the sale of motor vehicle licenses and the collection of motor vehicles sales and use taxes under the provisions of section 144.440, *782 RSMo, and who receives no salary from the department of revenue shall be authorized to collect from the party requiring such services additional fees as compensation in full and for all services rendered on the following basis:
(1) For each motor vehicle or trailer license sold, renewed or transferred  one dollar;
(2) For each application or transfer of title  one dollar;
(3) For each chauffeur's, operator's or driver's license  one dollar;
(4) No notary fee or other fee or additional charge shall be paid or collected.
2. This section shall not apply to agents appointed by the state director of revenue in any city where the department of revenue maintains an office. (Emphasis added.)
There are 158 fee agent offices in Missouri. At the time of Governor Bond's inauguration, 21 fee agent offices were operated by nonpartisan civic organizations, and one office was operated by a municipality. All other fee agent offices were held by Democrats who had been appointed, primarily, under the administrations of Democratic governors. Since his appointment as Director of Revenue, James has terminated 89 fee appointments held by Democrats and 3 nonpartisan civic organizations or municipalities. James has appointed agents to fill 104 fee agencies including 10 reappointments of existing agents of which 5 were nonpartisan civic organizations. Four new agents appointed by James are civic organizations. The majority of the remaining new appointees were Republicans although Democrats have also been appointed.
6. While the Department of Revenue does exercise a modicum of control over the general operation of the fee agent offices, it leaves management functions to the fee agents. Although fee agents are required to deposit the money collected for taxes and fees in state accounts, their own fees need not be accounted for. Accounting reports and bank statements must be filed. Relocation of a fee agent office requires prior notice to the Department of Revenue. Specific business hours are selected by the agent with notice to the Department of Revenue. The Department of Revenue also holds fee agent training seminars for fee agents and their employees which are attended at the expense of the agents. The Department of Revenue supplies most offices with the services of a photographer/vision tester, which persons are state employees, to assist customers in obtaining or renewing driver's licenses. These testers do not assist fee agents in collecting fees. The Department of Revenue also supplies a few of the offices with Wide Area Telephone Service (WATS) line.
7. But the Department of Revenue does not supervise the daily operations of the fee agent offices. Fee agents are free to hire employees to operate the offices for them or they may operate the offices themselves without additional personnel. Plaintiff Joos has several employees. The state does not assert control over the selection or retention of the fee agents' office employees. The plaintiff is responsible for withholding from her employees appropriate state and federal taxes. As provided for in § 136.055, RSMo 1978, fee agents are not compensated by the state but instead are authorized to charge persons requiring their services one dollar per transaction as compensation. Fee agents are free to select their office location (subject to the general requirement of reasonableness) and are required to pay their own operating expenses, including rent, employees' salaries and office equipment and supplies. Fee agents are permitted to engage in outside business activities and the majority do. Fee agents pay self-employment taxes and are not members of any state retirement system. The Department of Revenue does not have possession of keys to the office of the plaintiff, nor do the defendants otherwise have access to any locked areas within the fee office of the plaintiff. Fee agents do not account to the state for transaction service charges which they charge their customers, nor do they deposit these service charges, which represent their gross incomes, in state accounts. The plaintiff has not been included as an employee of the Department *783 of Revenue in any official state manual published after she assumed her position, nor does defendant James intend to list the plaintiff, or other fee agents, as an employee of his department in future official manuals to be published by the Secretary of State. Defendant James does not believe that he creates the relationship of employer-employee by appointing motor vehicle license agents. To the extent that a state of mind can be attributed to the State of Missouri, the Attorney General's Opinion issued on May 5, 1953, to the then State Comptroller and Director of the Budget by Attorney General John Dalton, represents the position of the state that motor vehicle license agents are not employees. The plaintiff does not consider herself an employee of the state. Defendants Bond and James have not required that any appointed or prospective fee agent employ specific individuals; that any appointed or prospective fee agent operate their fee agencies in specific locations; or that any appointed or prospective fee agent pledge any kind of political support as prerequisite to appointment. The Social Security Administration has determined, on the basis of an expansive and complete evidentiary record, that for Social Security tax purposes, fee agents are not employees of the State of Missouri. The State does not guarantee any agency will be profitable, and income of any specific agency will depend on the locale of the agency and the individual business acumen of the agent.
Finally, and of particular importance, there is no Department of Revenue requirement that the fee agents actually work at all in their agencies. The Department of Revenue does require that agents remain responsible for the work performed by their employees. The fee agents, like independent contractors, are merely responsible for supervision of their employees.
8. Plaintiff Joos operates the fee agent office in Lemay, Missouri. In 1980, 45,251 transactions occurred at her office, from which Joos netted substantial personal income.
9. Motor vehicle license agents serve at the pleasure of the Director of Revenue having no specific term to fulfill nor any tenured rights. Fee agents are not protected from arbitrary dismissal by the merit system statutes of Missouri. Fee agents are not administered an oath of office. Fee agents execute no official bond to cover misfeasance or malfeasances of their agency duties. The appointment of the plaintiff, and of all fee agents, was made solely by letter indicating the creation of an agency relationship. The plaintiff, and all fee agents, has not been commissioned pursuant to the provisions of Article IV, § 5, Constitution of Missouri (1945).
10. During 1980, motor vehicle license agents made a total of four and one-half million individual business transactions with members of the public. Total transactions in 1981 are expected to be similar in number. The manner in which these transactions are conducted, including the efficiency, cordiality, and administration loyalty exhibited by fee agents and their employees, reflects upon the State of Missouri, the Department of Revenue, and the incumbent administration. Fee agents do not make policy for the operation of the Department of Revenue, for they exercise little discretionary responsibility and have no supervisory function over any but their own employees. Fee agents do, however, have almost autonomous control over the operation of their individual fee agencies, and the manner in which that control is executed reflects upon state government and is associated, by the public, with the policy of the current administration.
11. No confidential relationship exists between fee agents, present or prospective, and the Director of Revenue or the Bond administration.
12. The staff of Governor Bond in making recommendations, and defendant James in making appointments, consider the partisan political affiliation of the successors to the plaintiff. Governor Bond's staff and defendant James have reviewed numerous recommendations by Republican leaders or other trusted persons suggesting replacements *784 for incumbent fee agents. They have also relied on state legislators of both parties, interested applicants, and recommendations from the general public. Defendant James, if he were to testify, would state his belief in the general proposition that fee agents must be courteous, efficient and loyal to the state in order to properly perform their functions as representatives of the administration. Mr. James would also testify that recommendations by the Governor and his staff would be tantamount to appointment. Executive policymakers do not supervise the day to day activities of fee agents and control is exercised primarily via the power to appoint.
13. The defendants have not, and do not, maintain that plaintiff was dismissed by reason of her misfeasance or malfeasance of agency.

Conclusions of Law
1. In 1976, the Supreme Court held that a nonpolicymaking, nonconfidential government employee cannot be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. Elrod v. Burns, 427 U.S. 347, 375, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). The plaintiffs in Elrod were non-civil-service employees of the Cook County, Illinois, Sheriff's Office, who held positions as the chief deputy, bailiff, and process server. It had been the practice for the incoming Sheriff of Cook County to replace such employees with members of his own party when the existing employees lacked or failed to obtain political support from the incoming sheriff's party. Elrod at 350-51, 96 S.Ct. at 2678-2679. The court found that dismissing those employees because of their political beliefs violated the First and Fourteenth Amendments. Elrod, 373, 375, 96 S.Ct. 2689, 2690. Justice Brennan's plurality opinion discussed several other aspects of the patronage system, including hiring practices, contract awards, and improved public services, but the court expressly did not rule upon the applicability of the holding to any class other than patronage dismissal of employees.
It might be reasonable to infer from Justice Brennan's plurality opinion that patronage in all its varies forms was an impediment to First Amendment exercise, and that all such patronage practices would be subject to the same restrictions as patronage dismissals. But a careful reading of the concurring opinion of Justices Stewart and Blackmun, together with the limitations expressed by Justice Brennan[1], constitutes the actual holding of the court which is limited to patronage dismissals of nonpolicymaking and nonconfidential public employees.
2. Four years later, in Branti v. Finkel, 445 U.S. 507, 519, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980), the Supreme Court held that the continued employment of an assistant public defender could not properly be conditioned upon his allegiance to the political party in control of the county government. Justice Stevens' majority opinion stated that "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; [but] rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." Branti at 518, 100 S.Ct. at 1294-1295. Justice Stevens noted the sweeping language contained in the Elrod plurality opinion and stated "[i]n that case, as in this however, the only practice at issue was the dismissal of public employees for partisan reasons. Elrod, 427 U.S. 353, 96 S.Ct. 2679-2680; id. at 374, 96 S.Ct. at 2690. In light of the limited nature of the question presented, we have no occasion to address petitioner's argument that there is a compelling governmental interest in maintaining a political sponsorship system for filling vacancies in the public defender's office." Branti 445 U.S. at 513, n. 7, 100 S.Ct. at 1292, n. 7. (Emphasis added.)
*785 3. The first issue to be determined is whether fee agents are "employees" of the State of Missouri, and, if not, whether the proscriptions of Branti should apply even in the absence of an employer-employee relationship. Missouri has adopted the test of the Restatement of Agency 2d, § 220, for determining whether an agent is an employee or an independent contractor. Cline v. Carthage Crushed Limestone Co., 504 S.W.2d 102 (Mo.1973).
The Restatement provides:
"(1) A servant [employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct of the performance of the services is subject to the other's control or right of control.
"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others are considered.
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business."
4. The Court finds that fee agents are not employees of the State of Missouri but are more in the nature of independent contractors or franchisees. First, there is no requirement that fee agents actually work in their offices. Fee agents may select their employees and then delegate duties to them without DOR approval. Aside from accounting for the tax and license money collected, fee agents operate their offices with autonomy not generally accorded state employees. Fee agents supply, at their own expense, office space and equipment, and pay salaries determined by the agents. Fee agents may, and frequently do, engage in other business endeavors. They may locate their fee agent office in commercial facilities. Agents are not paid by the state, but instead are statutorily authorized to charge the public for their services. Fee agents pay self-employment taxes. They are not members of the state retirement system. Plaintiff does not consider herself a state employee. The control exercised by the state is de minimis when compared to the degree of freedom afforded fee agents over the general operation of their offices. Fee agents are not supervised by executive policymakers as to the manner in which their offices are to be operated.
The establishment of fee agents has created a unique status for those holding these positions, quite unlike that of most secretaries, vision testers, cashiers, and clerks that work in the branch offices of the Department of Revenue. Such employees make no policy, have no confidential relationship with the officials of state government, and are paid a salary for work that they themselves must perform. They clearly qualified for the protection enunciated in Elrod and Branti.
5. Since fee agents are not state employees, they are not protected from dismissal because of their political affiliations. The protections of Elrod and Branti were expressly limited to state employees and their narrow holdings do not protect plaintiff herein. Accordingly, the court holds that since fee agents are not state employees, their appointments may be properly *786 terminated because of their political affiliation.
6. Both Elrod and Branti involved public employees who were discharged "solely because of their partisan political affiliation or nonaffiliation" (Elrod, supra at 426 U.S. at 349, 96 S.Ct. at 2678), or "solely because of his political beliefs" (Branti, supra 445 U.S. at 507, 100 S.Ct. at 1289, 63 L.Ed.2d at 577). Therefore, it is incumbent upon the plaintiffs to prove that political discrimination was a substantial or motivating factor in the defendants' appointment decisions. Tanner v. McCall, 625 F.2d 1183, 1193-1195 (5th Cir. 1980). To that end, defendant James' intentions and motivations in appointing new motor vehicle license agents is substantial and probative evidence. The plaintiff must prove that her termination was solely on the basis of political discrimination. The desire of defendants to appoint their own representatives to transact four and one-half million individual items of business with the citizens of Missouri, when there is no method of supervision over these independent contractors except the power to appoint, represents a neutral decisional criteria. Defendants have an interest in ensuring efficient and cordial representation in revenue matters. Because the intent of the appointing authority is relevant and probative to a making of a prima facie case, i. e., that the political affiliation of the plaintiffs was the sole reason for their termination, evidence of other motivations as for example the loyalty, efficiency, and cordiality of appointees who could be trusted by the administration is highly persuasive.
The decision of the Fifth Circuit in Tanner v. McCall, supra is illustrative. That case dealt with a suit brought by five former deputies and a former secretary against the newly elected sheriff of Lake County, Florida. The court discussed both Elrod and Branti and noted:
"The Court rejected a blanket exception for policy-making employees. The employer must show that the required political support or affiliation is relevant or essential to the job...." 625 F.2d at 1190.
The court noted also that it was the plaintiffs' burden to prove that the defendants' intent to discriminate or violate the plaintiffs' constitutional rights was "a substantial motivating factor" in the employment decision:
"When neutral decisional criteria are utilized by an employer, a plaintiff's case is more difficult to prove...." 625 F.2d at 1192.
Loyalty and efficiency are among the criteria which an employer may use in order to decide whether to terminate or retain or appoint a particular employee.
"If the first amendment motive is not the `but for' reason for the refusal to reappoint plaintiffs, their section 1983 action fails. [Citations omitted]." 625 F.2d 1195.
The court concludes that defendants, in appointing new agents, have considered more than mere politics.
7. While the Court expressly feels that plaintiffs are not employees, and therefore not shielded by Elrod, even had the Court determined them to be employed by the state, they still would not prevail, for Branti makes the comment that where "party affiliation is an appropriate requirement for the effective performance of the office," patronage dismissal may be allowed. Branti, 445 U.S. at 518, 100 S.Ct. at 1295.
The fee agents have more than four and one-half million contacts with the public during each year of their term and do serve as selected emissaries of the incumbent administration and thus reflect its concern for courtesy, efficiency, and integrity. Unlike civil servants who remain during all administrations, the fee agents are symbols of the governor's office who do not bring the usual disadvantages of patronage employees to their posts. The unique structure of the fee agent position minimizes the usual deficiencies of patronage.
First of all, there is little or no additional cost to the government, for the fees of the agents are simply added to the costs of the *787 licenses and taxes, thus allowing the state the full and complete measure of its taxing bounty.
Second, any citizen wanting to avoid the agent's small fee can seek out a branch office or utilize the mails to pay the license fees and taxes without paying the $1.00 fee. He may have to forego the convenience of location or scheduled availability, but that would be a luxury that he could judge the value of and accept or decline.
Third, the requirements for filling the position of fee agent are simple and generic, no special skill or professional knowledge is needed, and thus large numbers of individuals could easily qualify for the posts with little difficulty in completing the work required.
Fourth, while not requiring the confidentiality and policymaking function of the top-level positions in state government, there is the responsibility of demonstrating loyalty, efficiency, and partisan pride, which could be interpreted as a hallmark of the incumbent administration.
Fifth, fee agents operate free of the restraints imposed upon government employees and public officers, subject only to the appointing power of the state.
Sixth, the fee holder can delegate practically all of the chores and responsibility of the office to others that he employs, and thus continue to actively and fully participate in the political activities of his choice without the restriction of a civil service code or the loss of services to the state; and
Seventh, the novel status of motor vehicle license fee agents supports the argument that the state interest in having such an unusual arrangement is an intentional and planned circumstance, designed to meet and overcome the shortcomings of most patronage assignments.
In summary, then, the fee agents are extraordinarily suited for partisan, political appointment, and may well be a near perfect example of the kind of role suggested in Branti.
8. It is difficult to determine from the plurality opinion in Elrod if fee agents hold policymaking positions as excepted by that opinion. Clearly, they do not determine the revenue collecting policy of the state nor do they exercise any sovereign functions. They do, however, operate like 158 small businessmen selecting and compensating their own employees, selecting a place of business, supplying all necessary tools, instrumentalities and supplies, selecting business hours and days, and paying self-employment taxes. A determination of this issue is unnecessary in light of the other conclusions of law herein.
9. None of the fee agents now hold, nor would any of the Bond appointees hold, any confidential relationship to the Director of Revenue because of their fee agent status.
And yet, these fee agents, although limited in their policymaking and nonconfidential employees, are still not protected from patronage discharge, because Branti provides that, for some positions, "party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518, 100 S.Ct. at 1295. Fee agents are uniquely suited for that requirement.
10. It is apparent to this Court that partisan political affiliation played a role in a majority of the terminations. The Court does not find, however, that politics was the sole reason for these terminations. The evidence was replete with recommendations to Governor Bond by Republican leaders suggesting replacements for the Democratic incumbents although Democratic leaders and others also make recommendations. Defendant James would testify that he believes fee agents must have demonstrated loyalty to state government in order to properly and loyally perform their functions; he would indicate that recommendations by the Governor and his staff would be tantamount to appointment. Democrats and nonpartisan civic organizations have also been appointed or reappointed, however. Plaintiff Joos was not guilty of any misconduct or nonfeasance in any respect.
11. The dilemma as to the logical extension of the First Amendment rights in Elrod *788 and Branti to patronage activities in our government has been illustrated well by the concurring and dissenting opinions of the Justices; they will surely require delineation in the future. But a trial court is bound, as it must and should be, by express limitations established by the U. S. Supreme Court and those limitations are patently clear in the Elrod and Branti opinions. The Supreme Court now requires that those to be protected must be employees.
The Court is aware that the critical analyses of patronage in the opinions of the Supreme Court might someday lead to an extension of the protection now afforded. Other courts have found that the protections of Elrod and Branti extend to patronage hiring, demotions, and transfers, but in each case the disaffected party was clearly an employee. Tanner v. McCall, 625 F.2d 1183, 1189 (5th Cir. 1980); Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978); Morris v. City of Kokomo, 381 N.E.2d 510, 518 (Ind.App.1978); McKenna v. Fargo, 451 F.Supp. 1355, 1377 (D.N.J.1978). It is conceivable that in addition to employees, this extension could well include awards of government contracts, licenses, franchises, and other government benefits. But now the holdings are expressly limited to the partisan dismissals of state employees. Unless it is enlarged by appellate review, this Court must abide by the present status of the law.
Accordingly, judgment is entered for the defendants and against the plaintiff and the complaint is dismissed with prejudice at plaintiff's costs.
NOTES
[1] Justice Brennan recognized "[a]lthough political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons. Elrod, 427 U.S. at 353, 96 S.Ct. at 2679-2680. (Emphasis added.)