John PARKER, Rick Schilling, Plaintiffs,

v.

Alwynn J. CRONVICH, Richard Tompson, Defendants.

Civ. A. No. 77–1270.

United States District Court, E.D. Louisiana.

July 5, 1983.

Ellis Jay Pailet, New Orleans, La., for plaintiff Rick Schilling.

Gregory J. Avery, New Orleans, La., for plaintiff John Parker.

A.W. Wambsgans, Metairie, La., for defendant Alwynn J. Cronvich.

John Benz, Metairie, La., for defendant Richard Tompson.

CASSIBRY, District Judge:

On May 26 and 27, 1983, this case was tried to the Court sitting without a jury. Plaintiffs brought the action under 42 U.S.C. §§ 1982 and 1983, alleging that the defendants violated their civil rights under the First, Ninth, and Fourteenth Amendments to the Constitution. More specifically, plaintiffs complained that the termination of their employment as deputies in the Jefferson Parish Sheriff's Office was an illegal retaliation against their constitutionally protected exercise of the rights of free speech, free association, and free collective bargaining.[1]

## FINDINGS OF FACT

### I.

The plaintiffs in this suit are John Parker and Richard Schilling; both were deputies in the Jefferson Parish Sheriff's Office in 1976. The defendants are Alwynn Cronvich, who was the Sheriff of Jefferson Parish in 1976, and Richard Tompson, the chief criminal deputy under Sheriff Cronvich at all times pertinent to this litigation.[2]

### II.

In 1974, some of the deputies in Jefferson Parish formed the Jefferson Parish Deputies Association ("the Union").[3] As Sheriff Cronvich admitted, he was opposed to the Union's formation; he considered it both unnecessary and inappropriate. In 1975, Parker and Schilling joined the Union. Neither man was a particularly active par-

---

1. In addition, the Court allowed the plaintiffs to amend their complaint at trial to include an alleged violation of due process in that plaintiffs were terminated without a hearing. The right to a pretermination hearing hinges on whether the plaintiffs had a "sufficient expectancy of continued employment to constitute a protected property interest." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). The existence of a property interest must, in turn, "be decided by reference to state law." Id.; *Cf. Shawgo v. Spradlin,* 701 F.2d 470, 475 (5th Cir.1983) ("decided at least initially by a reference to state law [although] federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause.").

   At least initially, then, we must look to Louisiana law to determine if the position of deputy holds forth some expectation of continued employment. On this point, the state law is crystal-clear: "a deputy sheriff has no statutorily prescribed term of office, but merely serves at the pleasure of the sheriff." *Boyer v. St. Amant,* 364 So.2d 1338, 1340 (La.App. 4th Cir. 1978); *Soileau v. Zerangue,* 553 F.Supp. 845, 848 (W.D.La.1982). In Louisiana, a deputy is an appointee, not a member of civil service, and simply has "no right to expect nor basis for expecting continued employment." *Boyer,* 364 So.2d at 1341. In addition, the rules of the police department afford no right to a hearing for one who may have committed an infraction of those rules (as in the instant case). See "Rules for the Administration of the Department of Police," arts. 20–26. Unlike the situation in *Shawgo,* 701 F.2d at 476, no "rules or mutually explicit understandings" exist that might create a reasonable expectation of continued status for deputies in Louisiana.

   Be that as it may, if any imperfections existed in the hearing procedures for these plaintiffs' infractions, it appears they "have been cured by the district court's de novo hearing on the issue of the First Amendment violation," *Shawgo,* 701 F.2d at 480, as considered herein.

2. Cronvich was Sheriff of Jefferson Parish from 1964–79; Tompson was employed by the Sheriff's Office from 1960–83, and was Sheriff Cronvich's "right-hand man" from 1975–79.

3. The evidence does not contain the precise number of deputies in the Union.

ticipant: Parker did not pay dues or attend meetings, while Schilling's only comment regarding his participation was that he did not seek to hide the fact of his membership.

### III.

Sheriff Cronvich ran successfully for re-election in November of 1975. The Union supported one of his opponents.

### IV.

The incident which gave rise to this litigation occurred on September 27, 1976. That night, at a roll call, a sergeant was alerting the deputies on the "First Watch" to certain violations of radio procedures that had taken place the night before and warning them that such purposeful actions would not be tolerated. As the warning concluded, the sergeant asked if there were any questions. Deputy Schilling raised his hand and sought to ask the sergeant a question. It seems Deputy Schilling felt the sergeant's remarks were, at bottom, accusations directed toward him. The sergeant rebuffed the attempt, Schilling pressed his right to be heard, and the exchange turned into a "heated" encounter, with Schilling and the sergeant shouting back and forth.[4]

After the sergeant had told Schilling three times to "shut up and sit down," Lieutenant Jack Sander ordered Schilling to "hand in his badge and ID" (the trademark of a suspension). At this point, Deputy Parker entered the fray—shouting at the sergeant and lieutenant, stating that he too would turn in his badge and ID, and inquiring "what the f_____ is going on?" Lieutenant Sander then suspended Parker as

well. As Parker and Schilling left the roll call room, Parker told the men to "stand up and be counted" (or words to that effect). The two were then suspended for three days. Those were the first suspensions due to insubordination that Lieutenant Sander had ever ordered.

### V.

The three-day suspension mushroomed rapidly. By September 28, Lieutenant Lefevre had increased it to ten days. On September 29, defendant Tompson made the suspension indefinite and ordered an investigation of the incident by Internal Affairs. After reviewing the statements taken in connection with this investigation on December 6, 1976, Sheriff Cronvich terminated Deputies Parker and Schilling. This lawsuit followed.

### CONCLUSIONS OF LAW

### I.

Sheriffs in Louisiana have almost plenary authority and discretion in the selection of their deputies. In this context, the power to hire is the power to fire; since deputies lack any legal entitlement to their position, a sheriff may fire them for any number of reasons or for no articulable reason at all.[5] See *Barrett v. Thomas*, 649 F.2d 1193, 1199 (5th Cir.1981). A sheriff's discretionary domain is bound, however, by the United States Constitution, in particular, by the First Amendment liberties. Wide though it may be, a sheriff's discretion must not tread upon the protected freedoms to speak or to associate (whether to join a political party or a union). *See,*

---

4. From various statements taken afterward by Internal Affairs in the investigation of this matter, it is clear that the sergeant, Rainey, and the two deputies had been at odds for some time. Though other deputies elaborated and speculated somewhat on the background to this incident, the source of the friction remains unclear. Undoubtedly, however, animosity was in the air that night.

5. In some cases, a fired plaintiff may have a state cause of action for unlawful discharge, as suggested by dicta in *Boyer v. St. Amant,* 364 So.2d 1338, 1341 (La.App. 4th Cir.1978) ("because plaintiff was not fired, but rather not reappointed, there can be no cause of action for wrongful discharge"). This potential cause of action is not before the Court, nor does it affect my analysis of the federal liberties involved.

generally, *Barrett,* 649 F.2d at 1199; *Castleberry v. Langford,* 428 F.Supp. 676, 683 (N.D.Tx.1977). Section 1983 provides a remedy for a public employee discharged for constitutionally impermissible reasons.

## II.

In *Tanner v. McCall,* 625 F.2d 1183 (5th Cir.1980), the Fifth Circuit set forth a three-step inquiry to assess cases in which plaintiffs allege denial of their First Amendment rights:

(1) Assuming plaintiffs' allegations are true, was the defendants' conduct an impermissible infringement of First Amendment freedoms?

(2) Have plaintiffs met their burden of showing a constitutional deprivation?

(3) Have defendants rebutted plaintiffs' showing by proving that the same employment decision would have been reached regardless of the constitutionally protected conduct?

Id. at 1190.

■ In this case, plaintiffs' claim that their freedom to speak was somehow infringed fails at first step. The only "expression" by Schilling and Parker was the shouting match that developed on September 27, and both deputies conceded at trial that their actions amounted to insubordinations, if minimal ones. If Sheriff Cronvich's reasons for firing the two deputies were based solely upon that incident, then he fired them for insubordination, which was a matter committed to his discretion

and not in violation of their freedom of speech. Apart from a brief mention of the September 27 incident, the complaint contains no allegations that plaintiffs were ever prevented, directly or indirectly, from voicing their beliefs about the sheriff, the Union, or any election; nor does it contain any allegation that the sheriff fired them in order to prevent them from expressing themselves on some subject. In short, plaintiffs have failed to allege, or to prove, conduct by the defendants which impermissibly infringed their freedom of speech.[6]

However, plaintiffs have also alleged that Sheriff Cronvich, acting "in concert" with Chief Deputy Tompson, fired them because of (a) their support for Cronvich's political opponent, and (b) their membership in the Union. If only the latter were true, defendants would have violated the plaintiff's freedom of association.[7]

## III.

■ The second step: Have plaintiffs met their burden of showing a constitutional deprivation? I conclude not and, for the following reasons, must deny the plaintiffs' claims.

First, to hold otherwise would be to engage in a series of vaults and leaps of faith, of inferential gymnastics, that are simply unwarranted by the evidence. It is true that Sheriff Cronvich admitted his opposition to the Union. It is also true that, viewed from an impartial and uninvolved distance, the penalty of termination of Par-

---

**6.** The Supreme Court's reasoning in the recent case of *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) supports this conclusion. In *Connick,* the Court held that an employee's discharge due, in part, to her distribution of a questionnaire did not offend the First Amendment. Justice White, writing for the majority, stated:

When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

Id. at ——, 103 S.Ct. at 1689–90.

The expressions in the instant case were distinctly further removed from any notion of what constitutes matters of "public concern than those in *Connick.*

**7.** "It is ... settled in this Circuit that the First and Fourteenth Amendment right of association protects the right of public employees to join a union and that a § 1983 action is a proper vehicle for the vindication of such a right." *Castleberry v. Langford,* 428 F.Supp. at 683, citing *Orr v. Thorpe,* 427 F.2d 1129 (5th Cir.1970).

ker and Schilling seems rather out of proportion with their offense. Indeed, based on these two observations alone, I cannot say with absolute certainty that plaintiffs' union membership did not enter into the termination decision. What I can say, however, is that plaintiffs failed to *prove* as much by a preponderance of the evidence.

Beyond the bare facts of their union membership and their dismissal, plaintiffs could offer nothing more than a swirl of insubstantial rumors and incomplete statistics to support their position. Plaintiffs, Lieutenant Sander, and Barry Hymel (a union member who was not resworn in 1976) stated in one way or another that Sheriff Cronvich's animus toward union members was common knowledge. To prove this animus, each witness mentioned a few union members who were allegedly given "unfavorable" transfers, not resworn, or fired. However, as to transfers, Sheriff Cronvich explained that he and Chief Deputy Tompson did not even pick the deputies who were given a tour of duty at the parish prison (the unfavorable location). Instead, the district commanders sent two or three names to them; by and large, those were the deputies who went.

With regard to reswearings, plaintiffs' most forceful point was that none of the five union organizers were resworn. In response, Sheriff Cronvich offered cogent reasons for the non-reappointment of each; his testimony was largely uncontradicted. Moreover, "statistics" as to five men, where a police force numbering in the hundreds is concerned, do not provide a sufficient basis from which to draw an inference of something amiss.

The lack of solid evidence was ultimately devastating to the plaintiffs' suit. No witness could recall or point to a single statement by Sheriff Cronvich indicating that he somehow intended to treat the deputies in the Union differently. Neither Sheriff Cronvich nor Deputy Tompson mentioned anything to Internal Affairs about the way

it was to conduct the investigation; there was no evidence of any untoward influence by the defendants at any point in the investigative process. With no glaring departures from police procedures, no contemporaneous statements of animosity, and no plausible evidence of Parker and Schilling being "set up," statistics seemed a necessary, if not sufficient, component of the proof in this case.[8] Yet, plaintiffs failed to introduce, for example, the number of deputies who were members of the Union in 1975, the total number of deputies in 1975, and a breakdown of those deputies terminated (or even transferred to the prison) into union and non-union members.

Alternatively, plaintiffs produced no evidence concerning the Sheriff's treatment of prior insubordinations. They contended the penalty of dismissal was overly harsh; however, they could not support that contention with any figures on a "usual" penalty for insubordination, or on what normally constituted insubordination.

### IV.

"In this case, the objective manifestations do not supply inferences that rise to the level of proof of a subjective intent of political [or anti-union] animus." *Tanner v. McCall*, 625 F.2d at 1193. That statement applies with equal force to this case. Here, the one "objective manifestation" that was proven was Sheriff Cronvich's and Chief Deputy Tompson's own admission that they felt police departments and unions did not mix. Standing alone, this admission was not enough to discharge plaintiffs' burden of proof.

### V.

At trial, Sheriff Cronvich compared the police to the military. Though not necessary for my decision (in light of my conclusion that plaintiff failed to overcome the second *Tanner* hurdle), this vision of the police as military seemed best to explain the

---

**8.** On the role of statistics in proving intent, see

*Tanner v. McCall*, 625 F.2d at 1192–3, note 16.

Sheriff's decision to terminate Deputies Parker and Schilling. For, in testifying, Sheriff Cronvich stated that he viewed the two men's insubordination as "mutiny,"[9] and so, deserving of the harshest treatment. Harsh, indeed;[10] nevertheless, I found the Sheriff's statement credible and, in light of his uncontradicted testimony that he never knew Parker and Schilling were union members, and, consequently, never considered this fact in deciding to terminate them, and in view of the absence of statements or statistics to suggest the contrary, I am compelled to render judgment in favor of the defendants.

9.  A number of the statements taken by Internal Affairs make it clear that some dissension was building around the September 27 incident and the antagonistic relationship between Sergeant Rainey and the two deputies. Considerations of this nature may have influenced the Sheriff's decision.

In saying as much, I recognize that I do not need to know why Sheriff Cronvich fired Parker and Schilling, so long as the firing was not due to their political association or union membership. To some degree, however, the more plausible or justifiable the reasons given for termination, the less likely that such termination was for impermissible reasons.

10.  The treatment was not, however, beyond the scope of the Sheriff's authority. Plaintiffs had refused to obey a superior's orders in violation of Article 53 of the "Rules for the Administration of the Department of Police." Article 25 of the Rules provides that, when an infraction has occurred, the Sheriff may take "appropriate disciplinary action," which may include dismissal. Concerning the escalation from three days suspension to ten to indefinite to termination, it should be noted that each penalty was the *maximum* that the then-disciplining officer could impose. Only the Sheriff has the power to terminate a deputy.