**Charles L. BOALS, Plaintiff-Appellee, Cross-Appellant,**

v.

**Frank H. GRAY, Superintendent, Ohio State Reformatory, Defendant-Appellant, Cross-Appellee.**

Nos. 83–3887, 83–3896.

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1985.

Decided Oct. 22, 1985.

As Amended Oct. 24, 1985.

Rehearing and Rehearing En Banc Denied Dec. 9, 1985.

John C. Stamatakos, Asst. Atty. Gen., Christine Manuelian, argued, Columbus, Ohio, for defendant-appellant, cross-appellee.

James Melle, argued, Lucas, Prendergast, Albright, Gibson, Newman & Gee, Columbus, Ohio, for plaintiff-appellee, cross-appellant.

Before KENNEDY and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Charles L. Boals, plaintiff-appellee and cross-appellant in this case, is a former permanent non-probationary correctional officer of the State of Ohio. Boals commenced this action in 1976, in response to a five-day suspension imposed on him by Frank H. Gray, defendant-appellant and cross-appellee, seeking monetary and injunctive relief under 42 U.S.C. § 1983 and declaratory relief under 28 U.S.C. §§ 2201 & 2202. Boals contended that his first amendment rights were infringed because he was suspended for union activity; that although under state law he could only be suspended for cause, his suspension was imposed without due process; and that Ohio Rev.Code Ann. § 124.34 (Page 1984), insofar as it authorized short-term suspension of civil servants without due process, was unconstitutional on its face as applied.[1]

Following a non-jury trial, the District Court held that Boals was suspended without due process and in violation of his first amendment rights in retaliation for his union activity, and that Gray acted in bad faith and with malicious and oppressive intent. The Court awarded monetary damages equal to lost wages ($195.53) and ordered that the suspension be expunged from plaintiff's record on the due process claim, $5000 damages on the first amendment claim, and $5000 punitive damages. It dismissed plaintiff's claim seeking declaratory relief respecting the constitutionality of O.R.C. § 124.34 on the ground that since he was no longer employed by the State he lacked standing to seek such relief. The decision of the District Court is reported at 577 F.Supp. 288. Gray appeals the District Court's judgment awarding Boals monetary and injunctive relief, and Boals cross-appeals dismissal of his claim

---

1. Boals also claimed that he was deprived of the right under state law to choose a bargaining representative. The District Court at the outset of the case declined to exercise pendent jurisdiction over this claim. Boals does not appeal this decision and the state law claim is no longer at issue in this case.

challenging the constitutionality of the Ohio statute. We reverse the District Court on the appeal and affirm on the cross-appeal.

## I.

Plaintiff filed his complaint in the District Court on May 20, 1976. In its March 14, 1977 order, the court dismissed plaintiff's state law claim, *see* note 1 *supra*, overruled defendant's motions to dismiss plaintiff's first amendment and due process claims and for summary judgment, and granted defendant's motion that the court abstain from considering the constitutionality of O.R.C. § 124.34. The court concluded that § 124.34 "is susceptible of a construction whereby some procedure is mandated under Ohio law to be followed before suspensions of five days or less may be imposed, despite the fact that on its face it does not expressly provide or reject such a procedure," [2] and "that the question has not yet been presented to the courts of Ohio." The court ordered that this issue be held in abeyance pending adjudication by the parties in the state courts, providing the plaintiff commenced such an action within 30 days of the court's order.

Thereupon, a state court action seeking a declaratory judgment was commenced by the plaintiff in compliance with the District Court's order. The common pleas court found in favor of defendants, concluding that the interpretation of § 124.34 was governed by *Anderson v. Minter*, 32 Ohio St.2d 207, 291 N.E.2d 457 (1972), which held pursuant to § 124.34 that a civil servant suspended for five days or less could not have that suspension directly reviewed by the court. This decision failed to address the central question presented— whether or not Ohio law required some sort of procedure in imposing such suspensions.

The Franklin County Court of Appeals affirmed the trial court, although it did appear to acknowledge the right to some form of pre-suspension hearing as a matter of federal, rather than state law. The court then went on to conclude on the basis of the affidavits submitted by the defendants that the procedure followed in imposing plaintiff's suspension satisfied the requirements of *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).[3] The Ohio Supreme Court declined review. Upon being apprised of these results, the District Court resumed consideration of the instant case.[4]

## II.

The defendant concedes that plaintiff had a protected property interest created by O.R.C. § 124.34 not to be suspended

---

**2.** The statute provides, in pertinent part:

The tenure of every officer or employee in the classified service of the state and the counties, civil service townships, cities, city health districts, general health districts, and city school districts thereof, holding a position under this chapter of the Revised Code, shall be during good behavior and efficient service and no such officer or employee shall be reduced in pay or position, suspended, or removed, except as provided in section 124.32 of the Revised Code, and for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance, or nonfeasance in office....

In any case of reduction, suspension of more than three working days, or removal, ... the employee may file an appeal....

Ohio Rev.Code Ann. § 124.34 (Page 1984). At the time plaintiff was suspended in 1976, § 124.34 provided that suspensions of more than five days were appealable.

**3.** It did so over the objections of the concurring judge, who believed that the court should have confined itself to ruling on the constitutionality of § 124.34, the question presented by the plaintiffs.

**4.** There is no indication in the record before this Court on appeal that the defendant has ever contended that the state appellate court decision on the merits of plaintiff's federal claim should have res judicata or collateral estoppel effect. These are affirmative defenses which are waived if not specifically raised. *See, e.g., Blankner v. City of Chicago*, 504 F.2d 1037, 1043 (7th Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1678, 44 L.Ed.2d 901 (1975).

from work except for cause. In its March 14, 1977 order, the District Court found that the suspension of a state employee from employment for five days where such suspension may only be imposed for cause is not so minimal a deprivation of a property interest that the protections of the due process clause do not apply. *Accord Jackson v. Kurtz*, 65 Ohio App.2d 152, 158, 416 N.E.2d 1064 (1979) (citing unreported March 14, 1977 order).[5] In its final opinion and order, the court concluded that, inasmuch as plaintiff's short-term suspension was unreviewable under state law, and in consideration of the test formulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for determining the minimal requirements of due process appropriate in specific circumstances (weighing the private interest affected by official action, the risk of error of the challenged procedure and probable value of additional procedural safeguards, and the government interest involved), due process in this instance required: (1) written notice of charges and evidence given a reasonable time in advance of hearing; (2) a pre-suspension hearing before a neutral administrator with right to representation and questioning of witnesses; and (3) a written explanation of the administrator's decision. 577 F.Supp. at 295.

The District Court found the facts leading to plaintiff's suspension to be as follows:

[A]t the time of the events giving rise to this action, the plaintiff had been a civil service employee at the Mansfield, Ohio, Reformatory, for some four years. He had never had any disciplinary charges

made against him. The defendant was the Superintendent of the Reformatory. One Captain Hartson was an immediate superior of the plaintiff. The employment relationships between plaintiff and Hartson were cordial. They also were friendly socially.

Very shortly before the events in question, the plaintiff had joined a Union of employees at the Reformatory. He became active in its support, and encouraged other employees to join it.

On April 15, 1976, when plaintiff left work, he found a parking warning ticket on his car, although he had parked his car in that spot before without any problem.

When he came to work the next morning, he took his position in the deputy's office. Captain Hartson came through the door and said, "Charlie Boals, What's happening?" Plaintiff had the parking ticket in his hand. He said, "Does Gray got you handing these out?" Hartson replied, "Yep, sure does." Plaintiff said, "Why don't you take this and tell him to stick it up his ass." Hartson said, "Okay" and took the ticket.

Very shortly after that, plaintiff was told to go to defendant's office. He entered the office. Defendant was standing behind his desk. Hartson and another official, Charles Rowe, were seated behind plaintiff. Defendant asked him if he had seen the parking ticket before, if he had given it to Hartson, and if he had said defendant should stick it up his ass. Plaintiff responded "yes" to all those questions. Defendant immediately told him he had three days off for insubor-

---

5. In *Carter v. Western Reserve Psychiatric Habilitation Center*, 767 F.2d 270 (6th Cir.1985), the court held that a two-day suspension without pay involving a matter of routine discipline was a *de minimis* property deprivation not deserving of due process consideration. While we acknowledge this holding, decided and filed during our deliberations on the instant case, we do not regard it as dispositive of plaintiff's claims, and affirm the District Court's view that the suspension at issue was not *de minimis*. First, plaintiff's suspension was for five, not two days (albeit divisible into the initial three-day plus

additional two-day segments). Second, plaintiff asserts a first amendment as well as procedural due process claim. Although we reject plaintiff's claims on the merits, the first amendment claim raises considerations such as the potential chilling effect of plaintiff's suspension on himself and others that weigh against classification of his suspension as *de minimis*. Finally, we note that the *Carter* court recognized that even a two-day suspension without pay may constitute a property deprivation, and that its holding was confined specifically to the facts presented.

dination. Plaintiff then said, "Wait a minute. If this is the way it's going to be, I want the union representative, a lawyer. I want somebody here with me." Defendant said, "You have got five days off."

Plaintiff then raised a fuss, seeking to get the suspension increased so he could appeal it, but got nowhere.

*Id.* at 292. Applying its formulation to these facts, the court held that the "procedure" whereby "plaintiff was given 'notice,' a 'hearing' was held, and discipline was meted out all within a matter of minutes," did not satisfy the fundamental requirements of due process. *Id.* at 295.

Gray argues that the due process requirements specified by the District Court are inconsistent with the Supreme Court's opinion in *Goss v. Lopez, supra,* which dealt with school suspensions. Boals counters that the consequences of suspension of public employees from work, including injury to personal reputation, effect on future career opportunities, and loss of pay, are more serious than suspensions of students from school, and require greater procedural safeguards. *See Muscare v. Quinn,* 520 F.2d 1212, 1215 (7th Cir.1975), *cert. dismissed,* 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976); *Bagby v. Beal,* 455 F.Supp. 881, 888 (N.D.Pa.1978). While the argument that the process due public employees should be greater than that due students receiving suspensions of like duration is not without persuasiveness, we do not agree that the due process requirements attendant upon the imposition of short-term unreviewable suspension on non-probationary public employees are as extensive as those prescribed by the District Court. Since, as we explain below, it was neither necessary nor appropriate for the District Court to prescribe broadly applicable due process guidelines in this case, we disapprove the District Court's formulation and decline to substitute one of our own.

The District Court correctly acknowledged "that 'due process' is a flexible concept which necessarily is tailored to the time, place, and circumstances of the relevant property deprivation." 577 F.Supp. at 295 (citing *Mathews v. Eldridge,* 424 U.S. at 334, 96 S.Ct. at 902). Section 124.34 applies to, and therefore confers a property interest upon, "every officer or employee in the classified service of the state and the counties, civil service townships, cities, city health districts, general health districts, and city school districts thereof, holding a position under this chapter of the Revised Code." *See* Note 2 *supra.* Given the breadth of this coverage, it was inappropriate for the District Court to prescribe procedural due process guidelines of such general applicability.

In *Goss v. Lopez,* the Supreme Court held that

> due process requires, in connection with a suspension [from high school] of 10 days or less, that the student be given oral or written notice of the charges against him and, *if he denies them,* an explanation of the evidence the authorities have and an opportunity to present his side of the story....
>
> *There need be no delay between the time "notice" is given and the time of the hearing.*

419 U.S. at 581–82, 95 S.Ct. at 739–40 (emphasis added).

■ In the instant case, it is undisputed that Gray asked Boals if he had seen the parking ticket, given it to Hartson, and told Hartson to tell Gray to stick it up his ass, and that Boals answered yes to each question. Thus, Boals was informed of the charges against him, and did not deny them. Regardless of what procedure is due when a non-probationary public employee covered by O.R.C. § 124.34 contests the charges giving rise to a proposed short-term suspension, we disagree with the District Court that, under the particular facts in this case, where Boals admitted the charges, the procedure by which Boals was suspended was constitutionally defective.

Counsel suggested at oral argument that Boals could have brought out at a hearing that the remark in question was not made seriously and did not warrant a suspension,

had he been given greater advance notice and time to prepare his defense. Such was not, however, plaintiff's contention at trial. When asked by counsel what he would have done if he had been given time to prepare for a hearing, Boals stated only that "it would have give me an opportunity to find out how I was parking in violation." Moreover, the fact that Hartson reported the remark even though Boals and Hartson concededly were friends belies counsel's efforts to minimize its seriousness.

Nor was Boals taken by surprise when called to Gray's office. Although not specifically informed that disciplinary action was at issue prior to entering the office, he testified that "I had an idea that it was over the parking warning slip," and that, immediately after Gray increased his suspension from three to five days, he said, "No, no. Everytime somebody comes down here they get time off." Hartson corroborated the latter statement in part, testifying that Boals said, after Gray imposed the initial three-day suspension, "that the only time Mr. Gray called the employees to his office was to give them days off of [sic] disciplinary reasons."

The notice was adequate. There was no need to delay. We conclude that the District Court erred in awarding plaintiff damages for violation of his right to procedural due process.

### III.

The District Court awarded Boals $5000 as compensation for the discomfort and frustration caused by defendant's interference with his rights of freedom of speech and association. 577 F.Supp. at 296. In *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that, although such speech is not totally beyond the protection of the first amendment,

> When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal

court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior....

> Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.

461 U.S. at 147–48, 103 S.Ct. at 1690.

Neither the parties nor the District Court took notice of this decision prior to oral argument, and, needless to say, the defendant had not alleged error on this basis. Although "the general rule [is] that an appellate court will not consider sua sponte arguments not presented or urged by the litigants[,] ... [e]xceptional cases or particular circumstances may prompt a reviewing court, where injustice might otherwise result or where public policy requires, to consider questions neither pressed nor passed upon below." *Nuelsen v. Sorensen*, 293 F.2d 454, 462 (9th Cir.1961); *accord Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496, 500 n. 6 (2d Cir.1980). We requested of the parties that they be prepared at oral argument to address the import of the *Connick* decision on the instant case, and deem it appropriate to raise the issue of whether plaintiff's first amendment rights of speech and association as exercised in this case related to matters of public concern and hence gave rise to a cause of action in federal court. *See Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10.

### A.

■ The first step in our analysis must be to determine whether the *Connick* "public concern" test is applicable to the facts herein. In making this determination, two distinct issues must be considered. They are first, whether *Connick* applies to association as well as speech, and second, whether union-related speech and

association inherently touches on a matter of public concern as a matter of law.[6]

We have found no case that explicitly considers whether *Connick* encompasses association as well as speech, although various district courts have assumed both that it does and does not. *Compare Petrozza v. Incorporated Village of Freeport*, 602 F.Supp. 137, 143 (E.D.N.Y.1984) (*Connick* applies to speech and associational conduct), *with Gavrilles v. O'Connor*, 579 F.Supp. 301, 304 n. * (D.Mass.1984) (not necessary to consider freedom of speech claim in light of *Connick*, since plaintiff also alleged freedom of association claim), *and Parker v. Cronvich*, 567 F.Supp. 1073, 1076 & n. 6 (E.D.La.1983) (*Connick* applied to first amendment claim respecting insubordinate statements which led to discharge, but not to claim that plaintiffs were fired because they were union members).

The Court in *Connick* did not specifically refer to association in drawing the distinction between speech on matters of public concern and matters of private interest only. It did, however, suggest that its decision was simply an exposition of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1967), in which the Court held impermissible under the first amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its budgetary priorities. The Court went to some pains in *Connick* to trace the case law dealing with the constitutional rights of public employees, and concluded:

> In all of these cases, the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties *or other associations* that certain public officials might find "subversive."

461 U.S. at 144–45, 103 S.Ct. at 1689 (emphasis added). In other words, *Pickering* and *Connick*, while themselves speech cases, are based upon freedom of association cases. We perceive no logical reason for differentiating between speech and association in applying *Connick* to first amendment claims, and hold that it is so applicable.

It must still be considered whether union membership or speech is, as a matter of logic or precedent, inherently a matter of public concern. In *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam), the Court held that the first amendment protects the right of public employees to form unions. *See also Professional Association of College Educators (PACE) v. El Paso County Community College District*, 730 F.2d 258, 262–63 (5th Cir.1984); *Gavrilles*, 579 F.Supp. at 304. In *Connick*, however, the Court did not hold that speech by a public employee not on a matter of public interest was "totally beyond the protection of the First Amendment," but merely that such speech did not give rise to a cause of action in federal court "to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. at 147, 103 S.Ct. at 1690. Thus, applying *Connick* to union speech and activity is not inconsistent with the well-established principle that such speech and activity is protected by the first amendment.

■ In fact, *Connick* itself was just such a case. There the plaintiff was distributing a questionnaire to other employees relating primarily to the terms and conditions of their employment. The Court, however, characterized the questionnaire as reflective of "one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre," 461 U.S. at 148, 103 S.Ct. at 1691, and concluded, with one exception,[7] that it did

---

**6.** *See Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7 ("The inquiry into the protected status of speech is one of law, not fact.") & 150 n. 10, 103 S.Ct. at 1692 n. 10.

**7.** The Court held that a question asking assistant

not touch upon a matter of public concern. *Cf. American Postal Workers Union v. United States Postal Service*, 598 F.Supp. 564, 568–69 (D.D.C.1984) (postal worker's column in union newsletter, discussing strategies for increasing union membership and right to work movement, distinguished from speech at issue in *Connick*). We conclude that an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law.

### B.

◼ Having concluded that *Connick* is applicable to plaintiff's claim, we must consider whether the basis for his suspension was speech or association touching on a matter of public concern. We have no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering*. *See Grossart v. Dinaso*, 758 F.2d 1221, 1230 n. 12 (7th Cir.1985); *PACE*, 730 F.2d at 262–63. The District Court found that "the defendant's actions in this case were in substantial measure, if not entirely, the result of the defendant's hostility to union activities." 577 F.Supp. at 293. This is a factual finding subject to review under the clearly erroneous standard. *Anderson v. City of Bessemer City*, — U.S. —, —, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

◼ The only significant discrepancy between Boals' and Gray's testimony was that Gray testified that Boals became loud and abusive prior to rather than after imposition of the additional two day suspension, and that Boals never specifically asked for a union rep. The District Court found:

The facts of the case are rather simple, and with minor exceptions, there is no conflict in the testimony.... The Court has no doubt that the plaintiff's version of any conflicting elements of the testimony are true. The defendant's conduct, demeanor, and appearance, particularly when viewed in the light of all of the evidence and the circumstances of the case, indicate that he is essentially unworthy of belief. When he disputes what other witnesses say, the Court is impelled not to believe him.

577 F.Supp. at 292.[8]

In *Anderson v. City of Bessemer City*, the Supreme Court reemphasized the deference due district court findings under the clearly erroneous standard. However, the Court cautioned:

This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may find clear error even in a finding purportedly based on a credibility determination.

— U.S. at —, 105 S.Ct. at 1512–13.

Even crediting the District Court's findings respecting the sequence of events leading to the imposition of the suspension at issue, the court's ultimate finding, that Gray's anti-union animus was his reason for suspending Boals, is totally unsupported by the record and hence clearly er-

---

district attorneys if they " 'ever feel pressured to work in political campaigns on behalf of office supported candidates' " was of public concern. 461 U.S. at 149, 103 S.Ct. at 1691.

**8.** Hartson's testimony, which counsel contended supported Gray on these points, is not mentioned in the court's opinion. Hartson's testimony on these points, however, was equivocal. On direct examination, in response to two questions asking whether Boals had requested the presence of a union rep, Hartson replied "No sir;" but immediately thereafter, in response to two questions asking whether Boals or Gray ever mentioned labor unions, Hartson answered, "Not that I recall." On cross-examination, with respect to whether Boals became abusive prior to or after imposition of the additional two days, Hartson admitted that he was not sure of the sequence of events.

roneous. There was no testimony whatsoever at trial, even in the form of a bare accusation by Boals, that Gray knew he had joined the union or was out to get him for that reason.[9] Plaintiff's counsel conceded at oral argument that it was not alleged nor was there any evidence indicating that the ticketing of his car was harassment because of his union membership, rather than a legitimate effort to discourage the parking of cars at the location in question.[10]

In fact, technically there is no evidence in the record that Boals was even a member of the union. Twice counsel attempted on direct examination to question Boals about his union membership. On both occasions, defense counsel objected, and the objections were *sustained*. We find the District Court's holding in this case especially curious in light of the following colloquy during trial between the court and counsel:

BY MR. ABRAMOFF:

Q (Continuing) Were you a member of the Ohio Civil Service Employees Association at the time of this suspension?

MR. STAMATAKOS: Objection, Your Honor.

THE COURT: Sustained.

MR. ABRAMOFF: Your Honor, one of our counts is the allegation that our First Amendment rights were being infringed upon because of our union activities, and I would like to have Mr. Boals testify as to that.

THE COURT: This is not a First Amendment case we are dealing with. This is a due process case.

MR. ABRAMOFF: But I think there are First Amendment overtones alleged in our Complaint involving Mr. Boals' membership in the OCSEA.

THE COURT: I don't see how that would be relevant to the issues here. You can allege what you want to allege, but this is not a case in which union representation is involved in any way.

MR. ABRAMOFF: I think our point is not that our First Amendment rights were denied because we were not permitted union representation. I think our allegation is that Mr. Boals' participation in the OCSEA coming a very short time before this suspension was intimately connected with his being suspended....

THE COURT: Again, as I say, I don't take it that it makes any difference what the reason was for the discipline that was imposed or whether it was rightly or wrongly imposed....

MR. ABRAMOFF: Your Honor, may I make one comment?

THE COURT: Yes.

MR. MELLE: We agree with you wholeheartedly that one of the questions you have to decide is what process is due. You can't pose that question in a vacuum and say what process is due. What we are looking at is a public employee. We are looking at a state where you have no collective bargaining rights. You can't negotiate with your employer, but we are also looking at case law which says that you have the right in a labor setting to freedom of association.

THE COURT: This is not a labor setting.

. . . .

Maybe there are labor problems and maybe they have some relevancy, at least in the plaintiff's mind and possibly in the Defendant Gray's mind. I

---

**9.** Gray's uncontradicted testimony was that he did not even know who Boals was until the day Gray suspended him.

**10.** There was testimony from three employees, one of whom was suspended for preparing, and the other two for passing, a petition proposing a strike of correctional officers. These events occurred approximately six months after Boals' suspension. First, we note that in 1976, strikes by public employees were strictly prohibited under Ohio law by the Ferguson Act, Ohio Rev. Code Ann. § 4117.01 *et seq.* (Page 1980) (repealed). However, even if these incidents could be construed as probative of anti-union, animus on Gray's part, they do not establish any link between such animus and Boals' suspension. It is evidence of this essential link that we find totally absent in this record.

don't know what went on in their minds. . . .

The only conceivable support for the District Court's ultimate finding is in Boals' deposition, which contains the following exchange:

Q  Do you claim that you were disciplined because of your membership in the OCSEA?

A  I believe that had a lot to do with it, yes.

Q  How did that have a lot to do with your being disciplined?

A  Well, of all the time that I ever worked here, I never had any problems with nothing. Like I say, my work evaluations were all up and everything, and I never had any problems.

Then when I rejoined the union in '76 and got involved with this extra little committee on getting extra people in, all of a sudden I go out one night and there is a parking ticket and the next thing I know, I got time off and Captain Hartson has made a 180 on me and just the way everything came down. That is the only thing I can think of, it was discouraging the union.

Q  Did anybody ever tell you that Mr. Gray disciplined you because of your membership and effort on behalf of OCSEA?

A  No, no.

When we compare the wording of the findings of fact respecting the events surrounding Boals' suspension recited in the District Court's opinion with plaintiff's trial and deposition testimony, it is plain that the District Court was relying upon the deposition in its opinion. This reliance was improper. Plaintiff's deposition was neither stipulated to nor offered in evidence at trial. It was incumbent upon the plaintiff to ensure that portions of the deposition upon which it relied were admitted into evidence. *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168, 181 (D.C.Cir.), *cert. denied sub nom. International Ass'n of Fish & Wildlife Agencies v. Defenders of Wildlife,* *Inc.*, 454 U.S. 963, 102 S.Ct. 503, 70 L.Ed.2d 378 (1981).

Even if the deposition in question were properly part of the record before this Court, considered in its entirety it directly contradicts plaintiff's supposition that anti-union animus was the reason for his suspension. There is his own statement that no one ever told him that he was suspended for this reason. He also stated that "when Mr. Gray first came [as Superintendent], he got the place in an uproar, he had to establish that he was head cheese and what he said went, and any little thing that might happen or any big thing—I am not saying everything that came down was little—but he took over an institution that was lax and went completely the other way." This statement coincides with the District Court's finding, in awarding punitive damages, that "defendant's actions were . . . motivated . . . by the defendant's desire to flaunt the powers entrusted to him, in order to reduce his employees to abject surrender, and to increase his stature in his own eyes." 577 F.Supp. at 296–97.

The evidence of other incidents of discipline, inserted in the record by plaintiff for the purpose of showing lack of due process generally in the imposition of suspensions, suggests that a fairer characterization of defendant's conduct may be that he was a strict administrator attempting to correct a situation in which discipline was extremely poor. Regardless of which characterization is correct, however, either suggests that his reason for suspending Boals was *not* anti-union animus.

Finally, we regard the following admissions in the deposition as fatally inconsistent with plaintiff's supposition that he was suspended for his union activity:

Q  Had anyone ever told you that Mr. Gray was anti-union?

A  No.

Q  Would it be fair to say that, to your knowledge, no one has either stated that Mr. Gray was anti-union and, other than the one incident you had, there would be nothing else to indicate to you that Mr. Gray was anti-union?

A   Well, there were other cases. As far as people saying it, no; through his actions, yes. With Rick Hallock, Carl Witchie, these guys were not allowed representation, and to me that is anti-union.

. . . .

Q   Do you personally know any person who has been disciplined by Mr. Gray for union activities?

A   No.

Q   Have you ever heard of anyone here at Ohio State Reformatory being disciplined for his union activities?

A   No.

Boals also stated that at union meetings in Columbus that he attended, Gray was discussed on each occasion, "mostly [about] his having people down and not allowing them union representation in the office; no witnesses being with them; the one-sidedness of his manner." These statements do not support the conclusion that Gray *suspended* Boals or anyone else *because* of their union membership or activities. At most, they could only support an inference that Gray *refused to allow union representatives at disciplinary conferences* because he was opposed to the union. "But the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context to recognize the [union] and bargain with it." *Smith*, 441 U.S. at 465, 99 S.Ct. at 1828 (footnote omitted).[11]

■   Having carefully reviewed all of the evidence and inferences possible therefrom in the light most favorable to the plaintiff, we conclude that there is simply no evidence to support a finding that the initial three-day suspension imposed on Boals had any relationship to his union membership or activities. The only possible first amendment claim remaining is that the additional two-day suspension was tacked on because Boals made the statement, " 'Wait a minute. If this is the way it's going to be, I want the union representative, a law-

yer. I want somebody here with me.' " In our judgment, this is not indicative of speech or association touching on a matter of public concern. It is a challenge to Gray's authority, involving a matter of internal discipline of concern to Boals alone. *Cf. Parker v. Cronvich*, 567 F.Supp. at 1076 ("The only 'expression' by Schilling and Parker was the shouting match that developed on September 27, and both deputies conceded at trial that their actions amounted to insubordination, if minimal ones. If Sheriff Cronvich's reasons for firing the two deputies were based solely upon that incident, then he fired them for insubordination, which was a matter committed to his discretion and not in violation of their freedom of speech."). We conclude that the District Court's finding in favor of plaintiff on his first amendment claim must be reversed.

**IV.**

■   The District Court also awarded Boals $5000 in punitive damages. Since we have concluded that the defendant violated neither plaintiff's right to procedural due process nor his first amendment rights of speech and association, the punitive damages award must be vacated as well.

**V.**

■   The parties have argued extensively the question of whether Boals retained standing to present the question of the constitutionality of O.R.C. § 124.34 after leaving the employment of the State. In dismissing plaintiff's claim for declaratory relief, the District Court analogized to *Holt v. Moore*, 541 F.2d 460 (4th Cir.1976), in which a prisoner challenging certain state prison regulations sought damages as well as declaratory and injunctive relief. Because the plaintiff in *Holt* was released from custody after the action was commenced, the court held that he had no

11. The "context" in *Smith* was the State Highway Commission's policy of only considering grievances submitted directly by an employee to the designated employer representative. The Court reversed the District Court's finding, affirmed on appeal, "that this procedure denied the union representing the employees the ability to submit effective grievances on their behalf and therefore violated the First Amendment." 441 U.S. at 463, 99 S.Ct. at 1826.

interest in challenging the prison regulations, dismissing the requests for declaratory and injunctive relief as moot and remanding the case to proceed on the damages issue alone. None of the authorities presented by the cross-appellant are persuasive to the contrary. Those dealing with terminated employees are distinguishable because if plaintiffs prevailed they would be entitled to reinstatement. Nor is this case one "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Other public employees, either individually or as a class, could present an identical claim.[12]

## VI.

The judgment of the District Court finding defendant liable on plaintiff's due process and first amendment claims is reversed. The dismissal of plaintiff's claim seeking a declaratory judgment on the constitutionality of O.R.C. § 124.34 is affirmed.

WELLFORD, Circuit Judge, concurring.

I am entirely in accord with Judge Kennedy's extensive treatment and discussion of the initial three day suspension issue. In addition, I believe that initial suspension was *de minimis* property deprivation not deserving of due process consideration.

*See Carter v. Western Reserve Psychiatric Habilitation Center,* 767 F.2d 270 (6th Cir. 1985).

With respect to the additional two day suspension, making a total of five days, I would conclude that the entire suspension was not *de minimis,* and that the impact of the added time deserves further consideration. The additional suspension came about because Boals responded to the initial three day penalty:

"Wait a minute. If this is the way it's going to be, I want the union representative, a lawyer. I want somebody here with me."

Prior to that response there was no mention and no indication that Gray was aware of any union activity or that union adherence or interest of Boals' had any part whatever in opposing the initial three day suspension for a clear parking violation.

I am not prepared to reach a decision as to whether this response indicating a desire for union representation touched on a matter of public concern rather than merely a matter of interest personal to Boals. Since neither the parties nor the District Court took notice of the importance of this distinction, I would remand for consideration of this question. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

---

**12.** Even if plaintiff retained standing to have his claim decided by the District Court, it is clear that it is without merit. The statute is not unconstitutional on its face with respect to pre-short-term suspension procedures. As the District Court observed at the outset of this case, § 124.34 is silent with respect to such procedures. Nor is the statute unconstitutional in its application. The state courts have acknowledged that even short-term suspensions are subject to the minimum requirements of due process. *Jackson v. Kurtz,* 65 Ohio App.2d 152, 416 N.E.2d 1064; *see also Cleveland Board of Education v. Loudermill,* —— U.S. ——, ——, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (procedural due process is not conditioned by state statute that establishes substantive property interest in public employment). Moreover, plaintiff presented absolutely no evidence with respect to the procedures or lack thereof employed anywhere else in Ohio pursuant to § 124.34 or otherwise by which short-term suspensions are imposed. *Cf. Logan v. Zimmer-*

*man Brush Co.,* 455 U.S. 422 at 436–37, 102 S.Ct. 1148, 1158–59, 71 L.Ed.2d 265 (distinguishing "'random and unauthorized act by a state employee,'" quoting *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), from an "'established state procedure' that destroys his entitlement without according him proper procedural safeguards."). Finally, the statute is not unconstitutional on its face or as applied because it does not permit direct appeal of short-term suspensions. First, the state courts have held that although state law does not permit such an appeal, relief may be had under federal law pursuant to § 1983 where there has been a deprivation of due process. *Jackson v. Kurtz, supra.* Second, the fact that some suspensions may be "wrong," does not mean that the statute creates an unconstitutional irrebuttable presumption that such suspensions were for cause, as plaintiff contends, since such suspensions may only be imposed by some form of adjudicative procedure comporting with the minimum requirements of due process.

The proposed remand would involve a consideration only of whether the response in question was "indicative of speech or association touching on a matter of public concern." It would be concerned only with the validity of the additional two day suspension.

I further agree with Judge Kennedy's disposition of the punitive damage award, and her holding that O.R.C. § 124.34 has not been demonstrated to be unconstitutional on its face or in its application.